1  MARC J. WINTHROP – State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER – State Bar No. 166316
   ghollander@winthropcouchot.com
3  KAVITA GUPTA – State Bar No. 138505
   kgupta@winthropcouchot.com
4  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
5  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
6  Telephone:  (949) 720-4100
   Facsimile:   (949) 720-4111
7
   [Proposed] General Insolvency Counsel
8  for Debtors and Debtors-in-Possession

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                **SANTA ANA DIVISION**

12

13  In re:                                  Case No. 8:10-bk-12735 RK

14  ☒ ENIVEL, INC., a Hawaii corporation     Jointly Administered with Case Nos.
    ☒ CLEANERS CLUB ACQUISITION              8:10-bk-12742 RK; 8:10-bk-12740 RK;
15    SUB, INC., a California corporation     8:10-bk-12748 RK; 8:10-bk-12745 RK;
16  ☒ STEAM PRESS HOLDINGS, INC., a          8:10-bk-12746 RK; 8:10-bk-12736 RK;
      Hawaii corporation                      8:10-bk-12743 RK
17  ☒ U.S. DRY CLEANING SERVICES
      CORPORATION, a Delaware               Chapter 11 Proceedings
18    corporation, dba U.S. DRY
      CLEANING CORPORATION                  **DEBTORS' EMERGENCY MOTION FOR**
19  ☒ USDC FRESNO, INC., a California        **ORDER: (1) AUTHORIZING USE OF CASH**
      corporation                            **COLLATERAL AND GRANTING**
20  ☒ USDC FRESNO 2, INC., a California      **REPLACEMENT LIEN; AND (2) SETTING**
      corporation                            **FINAL HEARING ON MOTION;**
21                                           **MEMORANDUM OF POINTS AND**
    ☒ USDC PORTSMOUTH, INC., a              **AUTHORITIES**
22    California corporation
    ☒ USDC TUCHMAN INDIANA, INC., a         **[DECLARATION OF ROBERT Y. LEE IN**
23    California corporation                 **SUPPORT THEREOF FILED**
                                             **CONCURRENTLY HEREWITH]**
24
                                            [11 U.S.C. § 363]
25           Debtors and Debtors in
             Possession.                    DATE:      March 8, 2010
26                                          TIME:      3:30 p.m.
                                            PLACE:     Courtroom 5D
27                                                     411 West Fourth Street
                                                       Santa Ana, CA 92701
28

1

## **TABLE OF CONTENTS**

2                                                                                    **PAGE**

3   I.      INTRODUCTION ...................................................................................4

4   II.     STATEMENT OF FACTS .....................................................................4

5           A.    The Debtors.........................................................................4
            B.    Secured Claims ...................................................................5
6           C.    Events Precipitating The Debtors' Financial Difficulties and Efforts to
7                 Reorganize. ........................................................................5
            D.    The Debtors' Proposed Use of Cash Collateral. ...........................7

8
    III.    THE NEED FOR EMERGENCY RELIEF .................................................8
9

10  IV.     THE SECURED CREDITORS DO NOT HAVE AN INTEREST IN
            REVENUES GENERATED FROM THE DEBTORS' POST-PETITION
11          SERVICES    ...................................................................................9

12  V.      THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH
            COLLATERAL PURSUANT TO 11 U.S.C. § 363 ....................................11
13

14          A.    The Adequate Protection Burden.............................................12
            B.    The Debtors Have Satisfied Their Adequate Protection Burden.........13
15
                  1. The Creditor's Asserted Interests are Further Protected by the
16                Replacement Lien ..............................................................13
                  2. The Secured Creditors Are Adequately Protected by the
17                Maintenance and Preservation of the Debtors' Business................14

18  VI.     GOOD CAUSE EXISTS FOR HEARING THIS MOTION ON AN
19          EMERGENCY BASIS .......................................................................16

20  VII.    THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS
            MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH
21          THE REQUIREMENTS OF THE BANKRUPTCY RULES ....................17

22  VIII.   CONCLUSION.................................................................................17

23

24

25

26

27

28

## TABLE OF AUTHORITIES

PAGE

**Cases**

Days California ............................................................................................................... 11

In re Bering Trader, Inc.
    944 F. 2d 500, 502 (9th Cir. 1991) ......................................................................... 11

In re Big Hook Land & Cattle Co.
    81 B.R. 1001 (Bankr. D.Mont. 1988) ..................................................................... 10

In re Cafeteria Operators
    299 B.R. 400, 405 (Bankr. N.D.Tex.2003) ............................................................... 9

In re Cann & Saul Steel Co.
    76 B.R. 479, 483 (E.D. Pa. 1987) ............................................................................ 15

In re Center Wholesale, Inc.
    759 F.2d 1440, 1449 n.21 (9th Cir. 1985) .............................................................. 16

In re Days Inn California Riverside Limited Partnership
    27 F. 3d 374, 377 (9th Cir. 1994) ........................................................................... 11

In re Delbridge
    61 B.R. 484 (Bankr. E.D.Mich. 1986) .................................................................... 10

In re Everett Home Town Limited
    146 B.R. 453 (Bankr. D. Ariz. 1992) ...................................................................... 11

In re Glasstream Boats, Inc.
    110 B.R. 611, 612 (M.D. Ga. 1990) ........................................................................ 15

In re Hamilton
    18 B.R. 868 (Bankr. Colo. 1982) ............................................................................ 10

In re Harrington & Richardson, Inc.
    48 B.R. 431 (Bankr. D.Mass. 1985) ....................................................................... 12

In re Hotel Sierra Vista Ltd. Partnership
    112 F.3d 429, 432 (9th Cir. 1997) .......................................................................... 11

In re Karl A. Neise, Inc.
    16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) .............................................................. 15

In re Kidsstop of America, Inc.
    64 B.R. 397, 401 (M.D. Fla. 1986) ......................................................................... 14

In re Martin
    761 F.2d 472 (8th Cir. 1985) .................................................................................. 14

In re McCombs Properties VI, Ltd.
    88 B.R. 261 (Bankr. C.D. Cal. 1988) .......................................................... 12, 14, 15

In re McKim
    217 B.R. 97 (Bankr. D. R.I. 1998) .......................................................................... 11

In re Mellor
    734 F.2d 1396 (9th Cir. 1984) ................................................................................ 12

In re Pine Lake Village Apartment Co.
    16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) .............................................................. 15

In re Skagit Pacific Corporation
    316 B.R. 330 (9th Cir. BAP 2004) ............................................................................ 9

In re Stein
    19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) ............................................................... 15

In re Sullivan Ford Sales
    2 B.R. 350, 355 (Bankr. D.Me. 1980) ..................................................................... 16

In re Texas Tri-Collar, Inc.
    29 B.R. 724 (Bankr. W.D.La. 1983) .................................................................... 9, 10

In re Timothy Dean Restaurant & Bar
    342 B.R. 1 (Bankr. D.C. 2006) ................................................................................. 9

In re Transp. Design & Technology, Inc.
    48 B.R. 635 (Bankr. S.D.Cal. 1985) ....................................................................... 10

Ledgemore ........................................................................................................................... 13
United States v. Timbers of Inwood Forest
    484 U.S. 365, 108 S. Ct 626 (1988) ................................................................................ 12

**Statutes**
11 U.S.C. § 363 ...................................................................................................................... 9
11 U.S.C. § 363(c) ............................................................................................................... 16
11 U.S.C. § 363 (c)(2) ......................................................................................................... 11
11 U.S.C. § 363(c)(3) .......................................................................................................... 16
11 U.S.C. § 363(e) ........................................................................................................... 3, 12
11 U.S.C. § 506(a) .............................................................................................................. 14
11 U.S.C. § 506(c) ................................................................................................................ 9
11 U.S.C. § 522 ..................................................................................................................... 9
11 U.S.C. § 544 ..................................................................................................................... 9
11 U.S.C. § 546(b) ................................................................................................................ 9
11 U.S.C. § 547 ..................................................................................................................... 9
11 U.S.C. § 548 ..................................................................................................................... 9
11 U.S.C. § 552 .............................................................................................................. 10, 11
11 U.S.C. § 552(a) .............................................................................................................. 10
11 U.S.C. § 552(b) ........................................................................................................... 9, 10
11 U.S.C. § 1107(a) ............................................................................................................ 12

**Rules**
Rule 4001 of the Federal Rules of Bankruptcy Procedure ............................................... 17

**Treatises**
Collier on Bankruptcy 15th Ed. Revised, ¶ 552.02[1] (1998) ........................................ 10

MAINDOCS-#141026-v3-Enivel_Emrg_Mtn_Re_Cash_Collateral_Etc_.DOC

1    Pursuant to Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure, Enivel,

2  Inc., a Hawaii corporation; Cleaners Club Acquisition Sub, Inc., a California corporation; Steam

3  Press Holdings, Inc., a Hawaii corporation; U.S. Dry Cleaning Services corporation, a Delaware

4  Corporation, dba U.S. Dry Cleaning Corporation; USDC Fresno, Inc., a California corporation;

5  USDC Fresno 2, Inc., a California corporation; USDC Portsmouth, Inc., a California corporation;

6  and USDC Tuchman Indiana, Inc., a California corporation, the jointly administered debtors and

7  debtors-in-possession herein (collectively, the "Debtors"), hereby move ("Motion") this Court, on

8  an emergency basis, for an order:  (i) authorizing the Debtors to use any cash collateral of any

9  creditors who hold security interests against each of the respective Debtors' cash collateral

10  (collectively, "Secured Creditors") and granting to each of the respective Secured Creditors a

11  post-petition replacement lien as and for additional adequate protection of the Debtors' use of

12  such cash collateral; and (ii) setting a final hearing on this Motion.

13    In order to prevent disruption to the Debtors' business operations, the Debtors respectfully

14  request that the Court grant this Motion on an emergency basis.  The Debtors requires the

15  immediate use of cash collateral (as that term is defined by Section 363 of the Bankruptcy Code),

16  if any, of the Secured Creditors, to obtain funds necessary to maintain their operations.

17    By this Motion, the Debtors seeks an order authorizing the Debtors to use cash collateral

18  pursuant to the terms of the operating budgets (collectively, the "Budgets") attached as

19  Exhibit "1" to the Declaration of Robert Y. Lee ("Lee Declaration") filed concurrently herewith.

20  The Debtors seek approval for use of cash collateral on the following terms:

21    1.    The Debtors will be authorized to make expenditures during each four

22    week period for three months not to exceed 115% of the aggregate amounts contained in

23    the Budgets; any expenditures in excess of that amount will require the written approval of

24    each of the relevant Secured Creditors, or further order of the Court after appropriate

25    notice.  Budgets savings in any four week period may be carried over and used by the

26    Debtors in subsequent periods.

27    2.    The Debtors will grant to each of the respective Secured Creditors a

28    replacement lien in the Debtors' post-petition cash and accounts receivable and the

1   proceeds thereof, to the same extent, validity, and priority as any lien held by each

2   respective Secured Creditor as of the petition date, to the extent cash collateral is actually

3   used by the Debtors.

4       3.   The Debtors reserve the right to seek, at the final hearing on this Motion,

5   use of cash collateral on terms different from those contained in this Motion.

6   This Motion is based on the attached Memorandum of Points and Authorities and the Lee

7   Declaration filed concurrently herewith, which establish that the Debtors have met their burden

8   under 11 U.S.C. § 363(e) to use cash collateral of each respective Secured Creditor, and,

9   accordingly, should be permitted to use the purported cash collateral.

10   WHEREFORE, the Debtors respectfully pray that the Court enter an order:

11       a.   Finding that each of the Secured Creditor's interests in cash collateral are

12   adequately protected for various reasons, including the existence of a substantial equity

13   cushion in the respective collateral;

14       b.   Authorizing, on an interim basis pending final hearing on notice to

15   creditors, the Debtors' immediate use of the cash collateral pursuant to the terms and

16   conditions in this Motion;

17       c.   Setting a final hearing on this Motion; and

18       d.   Granting to the Debtors such other and further relief as the Court may deem

19   just and proper.

20   DATED: March 5, 2010          **WINTHROP COUCHOT**

21                                 **PROFESSIONAL CORPORATION**

22

23                                 By:___ /s/ Garrick A. Hollander_____
                                          Marc J. Winthrop
24                                         Garrick A. Hollander
                                           Kavita Gupta
25                                 [Proposed] General Insolvency Counsel for
                                   Debtors and Debtors-in-Possession
26

27

28

-3-

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## INTRODUCTION

4        The value of the collateral securing each of the Secured Creditors' claims continues to

5    increase, as reflected in the Budgets.  Moreover, the Debtors' business strategy, which requires

6    use of some cash collateral, as reflected in the attached exhibits, preserves the going concern

7    value of the Debtors' business.  Without the preservation of the Debtors' business as a going

8    concern and consequential use of cash collateral, each of the Secured Creditors would recover a

9    very small percentage of their claims, and unsecured creditors would be assured of receiving

10   nothing in these cases.  Based on the foregoing, the Debtors submit that each of the Secured

11   Creditors is adequately protected, and use of cash collateral is unquestionably in the best interest

12   of the estates.  The Debtors' senior secured creditors, Setal 1, Setal 2, Setal 3, Setal 4, Setal 5, and

13   Setal 6, support and consent to the Debtors' use of the cash collateral.

14

## II.

15

## STATEMENT OF FACTS

16       **A.    The Debtors.**

17       U.S. Dry Cleaning Services Corporation, a Delaware corporation, dba U.S. Dry Clean

18   Corporation ("USDC"), through its wholly owned subsidiaries[1] acquired in connection with its

19   strategy to "rollup" the highly fragmented dry cleaning industry, has become the largest owner

20   and operator of dry cleaning stores in the country.  The Debtors currently employ approximately

21   600 employees and own and operate 78 dry cleaning stores generating in excess of $25 million in

22

23

---

24   [1] USDC is the parent company of the following jointly administered debtors: USDC Tuchman Indiana, Inc.
("Tuchman"), which owns and operates 25 stores in Indianapolis; USDC Portsmouth, Inc. ("Portsmouth"), which

25   owns and operates 10 stores in Virginia; USDC Fresno, Inc. ("Fresno"), which owns and operates 10 stores in Fresno,
California and 2 in Arizona; USDC Fresno 2, Inc. ("Fresno 2"), which owns and operates 7 stores in Fresno,

26   California; Cleaners Club Acquisition, Sub, Inc. ("Club Sub"), which owns and operates 7 stores in the Inland Empire
in California; and Steam Press Holdings, Inc. ("Steam Press"), which is the parent company of Enivel, Inc. ("Enivel"),

27   which owns and operates 16 stores in Hawaii.  USDC is also the parent company of the following non-debtor entities:
US Dry Cleaning Franchise Corporation, ("USDCFC"), which has no assets or operations and is intended to serve as

28   the franchisor for the Debtors' operations once they begin to refranchise their stores; and USDCC CVR Merger Sub,
LLC, which used to own and operate stores in Palm Springs, but no longer has any assets or operations.

MAINDOCS-#141026-v3-Enivel_Emrg_Mtn_Re_Cash_Collateral_Etc_DOC

1  annual revenues. USDC, a publicly-traded Delaware corporation (UDRY.PK), is headquartered

2  in Newport Beach, California.

3       The Debtors' business model is based on acquiring market dominant dry cleaning chains,

4  improving efficiencies, refranchising and converting their stores into full service garment care

5  retail stores. The Debtors' operational efficiencies are based, in large part, upon their

6  development and implementation of an environmentally green centralized processing "hub and

7  spoke" model, where the hub is the sole dry cleaning plant for a geographically convenient group

8  of stores. This model enables the Debtors to produce a superior and more efficient cleaning

9  process for all stores. The hub and spoke model removes the actual processing of garments from

10  the retail stores, which allows the stores to focus entirely on customer service and building

11  revenue. Once the Debtors have improved the operational efficiencies, they intend to refranchise

12  the stores, which will convert the currently company owned stores into franchised stores. This

13  franchising opportunity offers franchisees the benefit of a turn key operation with an already

14  existing strong reputation in the community and a verifiable history of profits. Also critical to the

15  Debtors' business strategy, will be an expansion of the product and service offering to customers

16  to include full garment care such as repair and tailoring.

17       **B.    Secured Claims**.

18       Attached to the Lee Declaration as Exhibit "2" is a schedule of creditors who assert

19  secured claims against the Debtors' estates, along with the amount of such claims according to the

20  Debtors' books and records. The Debtors' senior secured creditors, Setal 1, Setal 2, Setal 3, Setal

21  4, Setal 5, and Setal 6, support and consent to the Debtors' use of the cash collateral. Attached as

22  Exhibit "3" is a schedule of estimated balances for cash, inventory and accounts receivable for

23  each of the Debtors as of the Petition Date.

24       **C.    Events Precipitating The Debtors' Financial Difficulties and Efforts to**

25          **Reorganize.**

26       USDC was founded in 2005 to consolidate the highly fragmented dry cleaning industry.

27  This rollup strategy requires significant capital for costs of acquisitions and assimilation of

28  centralized processing hubs into the stores' operations. The Debtors grew rapidly from

1   2006-2008, meeting their revenue and cash flow projections, and growing from 200 to

2   600 employees. In order to continue to implement their business strategy and finance their

3   operations and growth, in 2007, the Debtors' parent went public to obtain additional financing.

4   The Debtors' business model, operations and success was dependent upon the Debtors' ability to

5   access and obtain financing from the capital markets. Unfortunately, significant and critical debt

6   and equity financing that was expected became unavailable in light of the negative impact upon

7   and freezing of the capital markets caused by the economic turmoil, which occurred in October

8   2008. Consequently, the Debtors were forced to internally finance their operations through their

9   own working capital. The internal working capital alone, however, was not sufficient to finance

10  the Debtors' business, particularly given the significant debt amassed as a result of the

11  acquisitions and the model on which the Debtors had built their business and infrastructure,

12  including the timely and costly compliance with operating a publicly-traded company. Making

13  matters worse, the Debtors are currently being denied access and control over their 19 store

14  operation in Fresno, California and Arizona by a management company overseeing such

15  operation. This has further negatively impacted the Debtors' cash flow and ability to meet their

16  obligations.

17       Based on the foregoing, the Debtors have been late paying rent to many of their landlords,

18  resulting in receipt of many notices to pay rent or quit. In addition, many of the private or

19  personal loans used to finance the Debtors' operations are now becoming due.

20       In an effort to address their financial difficulties, prior to filing for Chapter 11, the Debtors

21  took the following steps to reduce overhead: (1) eliminated all investor relations activity,

22  resulting in annual savings of approximately $480,000; (2) eliminated legal and accounting

23  relating to stock support, resulting in annual savings of approximately $600,000; (3) reduced

24  levels of senior management and staff to minimal levels, resulting in annual savings of

25  approximately $1,240,000; and (4) eliminated assimilation consultants (senior management

26  absorbed the work), resulting in annual savings of approximately $700,000. In addition, the

27  Debtors significantly improved their debt structure, resulting in, among other things, less interest

28

1  expense, by converting $7,000,000 of debt into equity. As a further improvement to cash flow,

2  the Debtors' senior management deferred compensation to aid the Debtors' operations.

3      The Debtors are continuing to identify ways to increase revenues and sell franchises.

4  Unfortunately, much of the Debtors' success is dependent upon capital freeing up in the markets.

5  While the Debtors' actions will be instrumental in their efforts to reorganize, they are not

6  sufficient to resolve the Debtors' financial problems. Consequently, in order to preserve their

7  stores and overall operation, on March 4, 2010 ("Petition Date"), the Debtors filed voluntary

8  petitions under Chapter 11 of the Bankruptcy Code.

9      **D.**    **The Debtors' Proposed Use of Cash Collateral.**

10      The Debtors propose to use funds claimed as cash collateral by the Secured Creditors in

11  connection with the continued operation of the Debtors' business, in accordance with the

12  provisions of the Debtors' Budgets attached as Exhibit "1" to the Lee Declaration. The Debtors

13  propose to use any cash collateral of each of the Secured Creditors pursuant to the terms and

14  conditions set forth below:

15      1.    Budgets. The Debtors will be authorized to make the expenditures

16  provided for in the Budgets, and if necessary, to exceed the amounts set forth in the

17  Budgets by as much as 15% of budget total. Any expenditures in excess of this

18  authorization will require the written approval of each respective Secured Creditor, or

19  further order of the Court after appropriate notice. Budget savings in any month may be

20  carried over and used by the Debtors in subsequent months (i.e., to account for changes in

21  the timing of expenditures by the Debtors). After the expiration of the term of the

22  Budgets, the Debtors will be able to obtain use of any cash collateral of the Secured

23  Creditors by filing and serving an amended budget; if no objection to the terms of such

24  budget is filed within ten (10) days after the service of such budget, the budget will be

25  deemed to have been approved. If an objection is filed, such objection may be heard on

26  shortened time, and the Debtors shall have authority to use cash collateral pending a ruling

27  by this Court on such objection.

28

-7-

MAINDOCS-#141026-v3-Enivel_Emrg_Mtn_Re_Cash_Collateral_Etc_.DOC

1      2. <u>Replacement Lien</u>. As and for additional adequate protection of the

2  Debtors' use of any cash collateral of the Secured Creditors, each of the Secured Creditors

3  will be granted a replacement lien in the Debtors' post-petition cash, accounts receivable

4  and inventory, and the proceeds of each of the foregoing, to the same extent and priority as

5  any duly perfected and unavoidable liens in cash collateral held by such Secured Creditor

6  as of the Petition Date, limited to the amount of any cash collateral of such Secured

7  Creditor as of the Petition Date, to the extent that any cash collateral of such Secured

8  Creditor is actually used by the Debtors.

9      3. <u>Reservation of Rights</u>. The Debtors, the Committee and all other parties-

10  in-interest will reserve any and all rights that they may have to object to the claims of any

11  of the Secured Creditors and to object to the validity, priority and extent of the Secured

12  Creditors' liens, if any, encumbering the Debtors' assets.

13      4. <u>Financial Reporting</u>. The Debtors will provide to the Secured Creditors all

14  interim statements and operating reports required to be submitted to the Office of the

15  United States Trustee, and monthly cash flow reports, broken down by the expense line

16  items contained in the Budgets, within 15 days after the end of each monthly period after

17  the Petition Date.

18      5. <u>Final Hearing on this Motion</u>. The Debtors reserve the right to seek, at the

19  final hearing on this Motion, use of cash collateral different from that set forth herein.

20      Based upon the Budgets set forth on Exhibit "1," the Debtors believe that this Court

21  should authorize the Debtors' continued use of cash collateral in connection with their ongoing

22  business operations.

23  **III.**

24  **THE NEED FOR EMERGENCY RELIEF**

25      The preservation of the value of the Debtors' estates and the success of these Chapter 11

26  cases depend upon the Debtors' ability to obtain funds necessary to maintain the Debtors'

27  operations. To do so, the Debtors must be able to meet, without interruption, their cash needs for

28  post-petition purposes, fulfill their current customer orders, and pay other operational expenses

1    incurred in the ordinary course of their business. Since the Debtors have been unable to secure

2    financing, the use of cash collateral is critical to maximizing the return for the Debtors' creditors.

3    Conversely, if the Debtors are not allowed to use the cash collateral, the Debtors will be forced to

4    either dismiss this proceeding or convert it to a Chapter 7 proceeding (and liquidate their assets),

5    resulting in much lower returns to the Debtors' creditors.

6                                              **IV.**

7                          **THE SECURED CREDITORS DO NOT HAVE**

8                      **AN INTEREST IN REVENUES GENERATED FROM**

9                          **THE DEBTORS' POST-PETITION SERVICES**

10           A dry cleaning store generates revenue primarily from *the delivery of services*. Although

11   the Secured Creditors may have a lien on the cash and other assets held by the Debtors as of the

12   Petition Date, and this lien will extend to the "proceeds" of this collateral post-petition, *it will not*

13   *extend to the cash generated from the "services" component of the Debtors' business.* See, 11

14   U.S.C. § 552(b).[2] The cash from services is "after acquired property" and remains free and clear

15   of the bank's lien. In re Skagit Pacific Corporation, 316 B.R. 330 (9th Cir. BAP 2004)

16   ("Furthermore, revenue generated by the operation of a debtor's business, post-petition, is not

17   considered proceeds if such revenue represents compensation for goods and services rendered by

18   the debtor in its everyday business performance. In re Cafeteria Operators. 299 B.R. 400, 405

19   (Bankr. N.D.Tex.2003). Revenue generated post-petition solely as a result of a debtor's labor is

20   not subject to a creditor's pre-petition interest. Id.); In re Cafeteria Operators, L.P., 299 B.R. 400

21   (Bankr. N.D. Tex. 2003) (bank's lien only reach value of inventory sold not sale increment

22   attributable services); In re Timothy Dean Restaurant & Bar, 342 B.R. 1 (Bankr. D.C. 2006).

23   Accordingly, all revenues generated by the Debtors over and above the cost of the inventory sold

24   _____
     [2] Section 552(b) of the Bankruptcy Code states as follows:
            Except as provided in sections 363, 506(c), 522, 544, 544, 547, and 548 of this title, and notwithstanding section
25          546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the
            case and if the security interest created by such security agreement extends to property of the debtor acquired
26          before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts
            or other payments for the use occupancy of rooms and other public facilities in hotels, motels, or other lodging
            properties, then such security interest extends to such rents and such fees, charges, accounts or other payments
27          acquired by the estate after the commencement of the case to the extent provided in such security agreement,
            except to the extent that the court, after notice and a hearing and based on the equities of the case, orders
28          otherwise.
     11 U.S.C. § 552(b).

1  are not "cash collateral."  See also, In re Texas Tri-Collar, Inc., 29 B.R. 724 (Bankr. W.D.La.

2  1983) (pursuant to Section 552, a creditor's pre-petition blanket lien does not extend to post-

3  petition receivables);[3] In re Delbridge, 61 B.R. 484 (Bankr. E.D.Mich. 1986) (pre-petition security

4  interest in accounts receivables does not extend to post-petition receivables by operation of § 552);

5  In re Big Hook Land & Cattle Co., 81 B.R. 1001 (Bankr. D.Mont. 1988) (post-petition increases in

6  cattle herd through calf crop are not subject to lien resulting from after-acquired property clause in

7  security agreement and are therefore cut off by § 552(a));  In re Transp. Design & Technology,

8  Inc., 48 B.R. 635 (Bankr. S.D.Cal. 1985) (patent issued to debtor after filing petition does not

9  constitute proceeds of pre-petition patent; it was instead after-acquired property and operation of §

10  552(a) cuts off creditor's interest);  In re Hamilton, 18 B.R. 868 (Bankr. Colo. 1982) (crops planted

11  after petition are after-acquired property and § 552(a) cuts off lien).

12         In this regard, the noted treatise on bankruptcy law, Collier on Bankruptcy, states as

13  follows:

14         It must be emphasized that subsection (b)(1) creates an exception for proceeds,
           product, offspring or profits generated by pre-petition collateral, and **not for**
15         **'after-acquired' property obtained by the debtor or the estate postpetition.**

16  Collier on Bankruptcy 15th Ed. Revised, ¶ 552.02[1] (1998) (emphasis added).

17         Here, although the Secured Creditors may assert liens against substantially all of the assets

18  of the Debtors, and on the proceeds generated from this collateral, it is important to recognize that

19  a substantial part of the Debtors' post-petition income will be cash generated from services.  The

20  Debtors' post-petition cash collections, to the extent that they are generated from post-petition

21

22  [3] The Texas Tri-Collar court stated as follows:
         "Given the fact that this security agreement was entered into by [the debtor] before the commencement
         of the case, and considering that the receivables generated by [the debtor] after the filing of the petition
23       are "property acquired by the estate or by the debtor after the commencement of the case", the lien
         resulting from the assignment by [the debtor] to First National is rendered ineffective as to postpetition
24       receivables by operation of section 552(a).  [¶]
         . . . Since accounts receivable generated after commencement of the case are in no way proceeds,
25       product, offspring, rents or profits of prepetition accounts receivable, First National's security interest,
         pursuant to the Assignment and Pledge of Accounts Receivable, does not extend to postpetition
26       receivables under section 552(b). [¶]
         For the foregoing reasons, the court is of the opinion that the Assignment and Pledge of Accounts
27       Receivable executed by [the debtor] and First National prior to the commencement of the case does not
         extend to accounts receivable generated by [the debtor] after the filing of its petition for relief under
28       Chapter 11 of the Bankruptcy Code."
      29 B.R. at 726-727.

1  services, constitute after-acquired property pursuant to Section 552(a) of the Bankruptcy Code,

2  that is not subject to any of the exceptions provided for in Section 552(b) of the Bankruptcy

3  Code. See, In re Bering Trader, Inc., 944 F. 2d 500, 502 (9th Cir. 1991); In re Days Inn California

4  Riverside Limited Partnership, 27 F. 3d 374, 377 (9th Cir. 1994) ("The revenues derived from the

5  sale of food and drink and from other services provided by the hotel generate "accounts" that

6  cannot be classified as rent. ... The equitable purposes of bankruptcy and the balancing purpose

7  of § 552 require us to distinguish the two types of revenues."); In re Everett Home Town Limited,

8  146 B.R. 453 (Bankr. D. Ariz. 1992) (cart fees, greens fees and restaurant revenues not cash

9  collateral); In re McKim, 217 B.R. 97 (Bankr. D. R.I. 1998) (green fees are not cash collateral);

10  See also, In re Hotel Sierra Vista Ltd. Partnership, 112 F.3d 429, 432 (9th Cir. 1997) ("Our

11  decision in Days California provides the formula for determining the amount of revenues to which

12  liens may survive post-petition. In Days California, we stated that Hotel methods of accounting

13  will permit the identification of the revenues generated by the rooms and those generated by

14  services. Determination of the net revenues will require allocation of direct and indirect expenses

15  in proportion to each category of revenue. ... Thus, proving the extent of one's interest involves

16  submitting evidence that enables the bankruptcy court to determine the sum to which the party

17  asserting the security interest is entitled"). Accordingly, the Debtors' adequate protection burden

18  extends only to the limited value attributable to the accounts receivable and the cash on hand as of

19  the Petition Date, and an allocation of the proceeds generated from the use of inventory on hand

20  as of the Petition Date.[4] The value of this collateral pool and the proceeds thereof is very limited,

21  as illustrated in Exhibit "3" and sufficient replacement collateral will be generated through the

22  Debtors' post-petition operations in order to provide to the Secured Creditors adequate protection

23  of their interests therein.

24  **V.**

25  **THE DEBTORS SHOULD BE AUTHORIZED TO USE**

26  **CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363**

27

28  [4] As set forth in the Lee Declaration, the cost of the Debtors' inventory generally constitutes approximately 4-6 % of the Debtor's sales.

1    The provisions of 11 U.S.C. § 363(c)(2) govern a debtor's use of cash collateral.

2    Section 363 (c)(2) provides, in pertinent part, as follows:

3    > The trustee [or debtor in possession] may not use, sell or lease cash
     > collateral…. unless:

4    >     (A)    each entity that has an interest in such cash collateral consents; or

5    >     (B)    the court, after notice and a hearing, authorizes such use, sale, or
     >             lease in accordance with the provisions of this section.

6    11 U.S.C. § 363(c)(2).

7    Therefore, the Court may authorize use of a creditor's cash collateral in the absence of

8    creditor consent. See, 11 U.S.C. § 363(e). A debtor-in-possession has all the rights and powers of

9    a trustee with respect to property of the estate, including the right to use property of the estate in

10   compliance with Section 363 of the Bankruptcy Code. See, 11 U.S.C. § 1107(a).

11   Section 363(e) of the Bankruptcy Code provides that, upon the request of an entity that has

12   an interest in property proposed to be used by the debtor, the court may prohibit or condition such

13   use "as is necessary to provide adequate protection of such interest."

14   Therefore, this Court may authorize the Debtors' use of any cash collateral of the CIT

15   Group upon determining that the interest of the CIT Group in any cash collateral will be

16   adequately protected. In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988).

17   **A.**     **The Adequate Protection Burden.**

18   To obtain court authorization to use cash collateral, a debtor must establish that the

19   "interest" of creditors holding liens on the subject collateral will remain "adequately protected."

20   11 U.S.C. § 363(e). Pursuant to United States v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.

21   Ct 626 (1988), the "interest in property" entitled to adequate protection under 11 U.S.C. §363(e)

22   is no more or less than the "value of the collateral" that is subject to the secured creditor's lien.

23   Under this holding, a debtor is merely required to show that the secured creditor's collateral base

24   will not be placed at risk. Timbers, 108 S. Ct at 633.

25   In addition to the foregoing, a debtor can make an adequate protection showing even

26   where the collateral is declining, so long as the creditor's interest is protected by a reasonable

27   equity cushion. See, In re Mellor, 734 F.2d 1396 (9th Cir. 1984); In re Harrington & Richardson,

28

1     Inc., 48 B.R. 431 (Bankr. D.Mass. 1985); In re McCombs Properties VI, Ltd., 88 B.R. 261

2     (Bankr. C.D.Cal. 1988).

3        **B.**     **The Debtors Have Satisfied Their Adequate Protection Burden**

4            **1.**     **The Creditor's Asserted Interests are Further Protected by the**

5                  **Replacement Lien**

6          Under the Debtors' cash collateral proposal, the Secured Creditors' interest in

7     collateral will be further protected from a diminution in value through replacement liens

8     granted to the Secured Creditors. Under the Debtors' proposal, each of the Secured

9     Creditors will be granted, in accordance with their priority, a replacement lien, in the

10    Debtors' post-petition cash and accounts receivable and the proceeds thereof, to the same

11    extent, validity, and priority as any lien held by each respective Secured Creditor as of the

12    Petition Date, to the extent cash collateral is actually used by the Debtors. For example, if

13    Debtors use $100,000 of pre-petition cash collateral, the relevant Secured Creditor will be

14    granted a lien, to the extent of $100,000, in the proceeds of the cash collateral.

15          However, since the function of adequate protection is only to preserve and not to

16    increase the collateral subject to a secured creditor's interest, any additional value created

17    through the Debtors' use of the cash collateral, whether in the form of inventory, accounts

18    receivable or cash, will not be subject to a replacement lien, but will instead constitute an

19    asset of the estate that all creditors will ultimately be able to look for payment. See,

20    Ledgemore, supra, 116 B.R. at 343 (so long as the receivables being collected and used by

21    the debtor are being replaced by sufficient new receivables in which the creditor is granted

22    a security interest, the creditor is adequately protected). Thus, each of the respective

23    Secured Creditors' replacement liens should be limited to the amount of any cash

24    collateral in existence as of the Petition Date.

25          Although the replacement lien will, in concept, ensure the preservation of the

26    Secured Creditors' interests in the cash collateral, in reality, the liens will perform this

27    function only if the Debtors, in fact, generate at least one dollar of value for every dollar of

28    cash collateral expended. The evidence that addresses this issue is contained in the Lee

MAINDOCS-#141026-v3-Envel_Emrg_Mtn_Re_Cash_Collateral_Etc_.DOC

1    Declaration and specifically each of the Budgets, which are attached collectively as

2    Exhibit "1" to the Lee Declaration. The Budgets indicate that the Debtors will operate on

3    a cash flow positive basis during the budgeted period, and that their assets will increase in

4    value during such period.

5           The Debtors believe that the projections of their business operations as set forth in

6    the Budgets are reasonable. The business assumptions underlying the operations projected

7    in the Budgets are essentially in accordance with the Debtors' historical experience, as

8    adjusted to take into account recent or projected events (e.g., the recent downturn in the

9    economy). Accordingly, the Debtors believe that the budgets establish that the proposed

10   replacement liens being granted to each of the Secured Creditors will adequately protect

11   the Lenders' alleged interests.

12          In summary, the Lee Declaration provides evidence to establish with reasonable

13   certainty that the Debtors' use of any cash collateral of the Secured Creditors will result in

14   an increase in the estates' collateral pool, thereby adequately protecting each of the

15   Secured Creditors' interests in any cash collateral.

16          **2.      The Secured Creditors Are Adequately Protected by the Maintenance**

17   **and Preservation of the Debtors' Business**

18          To determine the sufficiency of adequate protection, a bankruptcy court should:

19   (1) establish the value of the secured creditor's interest; (2) identify the risk, if any, to the

20   value of the secured creditor's cash collateral resulting from the debtor's request for the

21   use of the cash collateral; and (3) determine whether the debtor's adequate protection

22   proposal protects the value of the cash collateral as nearly as possible against risk to that

23   value consistent with the concept of indubitable equivalence. McCombs, supra, 86 B.R.

24   at 267 (quoting In re Martin, 761 F.2d 472 (8th Cir. 1985)).

25          To establish the value of a secured creditor's interest, the bankruptcy court must

26   consider the purpose of the valuation, and the proposed disposition or use of the secured

27   property. See, 11 U.S.C. § 506(a). "One of the primary factors to be considered in

28   valuation is whether the subject property is to be used and retained by the debtor or

-14-

MAINDOCS-#141026-v3-Enivel_Emrg_Mtn_Re_Cash_Collateral_Etc_.DOC

1    whether the property is to be disposed of." In re Kidsstop of America, Inc., 64 B.R. 397,

2    401 (M.D. Fla. 1986).

3        Here, cash collateral consists of, among other things, the daily receipts generated

4    by the operations of the Debtors' business. The value of any such cash collateral will

5    depend, in large part, upon the preservation of the Debtors as a going concern. It follows

6    that the risk to this going concern value of cash collateral (which risk is required to be

7    identified by the Court in the McCombs test above) consists of any cessation in the

8    Debtors' business operations. See, In re Glasstream Boats, Inc., 110 B.R. 611, 612 (M.D.

9    Ga. 1990) (it was in the best interest of both the debtor-in-possession and the creditor that

10   the debtor "continue in their operation as a manufacturing facility" and that "denial of this

11   motion would result in another shut down of the assembly line, which the court doesn't

12   feel is in the best interest of either party."). See also, In re Cann & Saul Steel Co., 76 B.R.

13   479, 483 (E.D. Pa. 1987) (continued operation of manufacturer debtor was in the best

14   interest of secured creditor in that it was likely that the secured creditor would realize

15   more funds than it would by requiring the debtor to cease operations); In re Stein, 19 B.R.

16   458, 460 (Bankr. E.D. Pa. 1982) (the bankruptcy court allowed a debtor to use cash

17   collateral where the secured party had no equity cushion for protection, finding that the

18   use of the cash collateral was necessary to the continued operations of the debtor, and that

19   the creditor's "secured position can only be enhanced by the continued operation of the

20   [debtor's business]"); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr.

21   S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to

22   preserve the value of real property which also secured creditor's claim); In re Karl A.

23   Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor

24   adequately protected by lien in post-petition property acquired by debtors; debtors can use

25   cash collateral "in the normal operation of their business").

26        Here, even a temporary cessation of the Debtors' ability to operate their business,

27   caused by any lack of access to any cash collateral, will result in a substantial diminution

28   of the Secured Creditors' collateral, as customers will turn to competitors of the Debtors'

-15-

1  for their dry cleaning needs, resulting in a liquidation of the Debtors' business.  In

2  contrast, as shown in the Budgets, Debtors' ongoing operations will preserve the value of

3  the Secured Creditors' interests in any cash collateral, thus providing adequate protection.

4  **VI.**

5  **GOOD CAUSE EXISTS FOR HEARING THIS**

6  **MOTION ON AN EMERGENCY BASIS**

7  In recognition of the fact that Section 363(c) of the Bankruptcy Code operates to deprive a

8  debtor of the use of critical operating capital as of the filing of the debtor's Chapter 11 petition,

9  Congress specifically provided in Section 363(c)(3) that a hearing on cash collateral "shall be

10  scheduled in accordance with the needs of the debtor." Accordingly, the Bankruptcy Code

11  expressly anticipates and authorizes expedited hearings on the issue of cash collateral use. See,

12  11 U.S.C. § 363(c)(3).

13  Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim relief

14  may be crucial to the success of a corporate reorganization:

15
16  We realize that 'in certain circumstances, the entire reorganization effort may be
   thwarted if emergency leave is withheld' and that reorganization under the
   Bankruptcy Code 'is a perilous process, seldom more so than at the outset of the

17  proceedings when the debtor is often without sufficient cash flow to fund
   essential business operations.' It is for this reason that Congress specified that

18  hearings concerning the use of cash collateral 'shall be scheduled in accordance
   with the needs of the debtor.'

19

20  In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis added) (citations

21  omitted). See also, In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr. D.Me. 1980).

22  In these cases, the Debtors need immediate use of cash collateral in order to meet the daily

23  costs and expenses of operating their business in order to preserve the value of their assets. Since

24  the Debtors have been unable to secure alternative financing, the use of cash collateral is critical

25  to maintaining the Debtors' operations and to maximizing the return for the Debtors' creditors.

26  Accordingly, good cause exists to hear this Motion on an emergency basis.

27

28

MAINDOCS-#141026-v3-Enivel_Emrg_Mtn_Re_Cash_Collateral_Etc_.DOC

1

## VII.

## THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS

## MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH

## THE REQUIREMENTS OF THE BANKRUPTCY RULES

By this Motion, the Debtors are requesting that the Court schedule a final hearing on this

Motion as soon as possible in accordance with the requirements of the Federal Rules of

Bankruptcy Procedure.  Rule 4001 of the Federal Rules of Bankruptcy Procedure provides that the

Court may commence a final hearing on this Motion no earlier than fifteen (15) days after service

of the Motion.  The Debtors needs to obtain as promptly as possible approval of the permanent

use of the cash collateral in order to ensure the Debtors can maintain the going concern value of

their business with as little disruption as possible.  A final hearing on this matter should be held as

soon as possible after the expiration of the fifteen (15) day period provided for by Rule 4001 of

the Federal Rules of Bankruptcy Procedure, in order to prevent closure and liquidation of the

Debtors' business.

## VIII.

## CONCLUSION

Based upon the foregoing, the Debtors respectfully request that this Court enter their order

granting the relief prayed for herein.

Dated: March 5, 2010

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

By:   /s/ Garrick A. Hollander
  Marc J. Winthrop
  Garrick A. Hollander
  Kavita Gupta
[Proposed] General Insolvency Counsel for
Debtors and Debtors-in-Possession

-17-

1

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

2

# PROOF OF SERVICE OF DOCUMENT

3

4

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive., 4th Fl., Newport Beach, CA 92660.

5

6

7

8

A true and correct copy of the foregoing document described as **DEBTORS' EMERGENCY MOTION FOR ORDER: (1) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIEN; AND (2) SETTING FINAL HEARING ON MOTION; MEMORANDUM OF POINTS AND AUTHORITIES [DECLARATION OF ROBERT Y. LEE IN SUPPORT THEREOF FILED CONCURRENTLY HEREWITH]** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

9

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 5, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

10

11

12

13

- Frank Cadigan    frank.cadigan@usdoj.gov
- Garrick A Hollander    sconnor@winthropcouchot.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Marc J Winthrop    pj@winthropcouchot.com

14

☐ Service information continued on attached page

15

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

16

17

18

19

☐ Service information continued on attached page

20

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

21

22

23

☐ Service information continued on attached page

24

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

25

26

| March 5, 2010 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| Date | Type Name | Signature |

27

28

-18-