MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthropcouchot.com
GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@winthropcouchot.com
KAVITA GUPTA – State Bar No. 138505
kgupta@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:   (949) 720-4111

[Proposed] General Insolvency Counsel
for Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>☒ ENIVEL, INC., a Hawaii corporation<br>☒ CLEANERS CLUB ACQUISITION SUB, INC., a California corporation<br>☒ STEAM PRESS HOLDINGS, INC., a Hawaii corporation<br>☒ U.S. DRY CLEANING SERVICES CORPORATION dba U.S. DRY CLEANING CORPORATION, a Delaware corporation<br>☒ USDC FRESNO, INC., a California corporation<br>☒ USDC FRESNO 2, INC., a California corporation<br>☒ USDC PORTSMOUTH, INC., a California corporation<br>☒ USDC TUCHMAN INDIANA, INC., a California corporation<br><br>Debtors and<br>Debtors in Possession. | Case No. 8:10-bk-12735 RK<br><br>Jointly Administered with Case Nos. 8:10-bk-12742 RK; 8:10-bk-12740 RK; 8:10-bk-12748 RK; 8:10-bk-12745 RK; 8:10-bk-12746 RK; 8:10-bk-12736 RK; 8:10-bk-12743 RK<br><br>Chapter 11 Proceedings<br><br>**DECLARATION OF ROBERT Y. LEE IN SUPPORT OF THE FOLLOWING MOTIONS:**<br><br>**1.    CASH COLLATERAL**<br>**2.    CONTRACT REJECTION AND TURNOVER**<br>**3.    PAYROLL**<br>**4.    UTILITY**<br>**5.    LIMIT NOTICE**<br><br>DATE:    March 8, 2010<br>TIME:    3:30 p.m.<br>PLACE:    Courtroom 5D<br>        411 West Fourth Street<br>        Santa Ana, CA 92701 |

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions.DOC

I, Robert Y. Lee, hereby declare as follows:

1.    I am the President for Enivel, Inc., a Hawaii corporation ("Enivel"), Cleaners Club Acquisition Sub, Inc., a California corporation ("Club Sub"), Steam Press Holdings, Inc., a Hawaii corporation ("Steam Press"), U.S. Dry Cleaning Services Corporation, a Delaware corporation, dba U.S. Dry Cleaning Corporation ("USDC"), USDC Fresno, Inc., a California corporation ("Fresno"), USDC Fresno 2, Inc., a California corporation ("Fresno 2"), USDC Portsmouth, Inc., a California corporation ("Portsmouth") and USDC Tuchman Indiana, Inc., a California corporation ("Tuchman"), the jointly-administered debtors and debtors-in-possession in the above Chapter 11 proceedings (collectively, the "Debtors"), and have been responsible for overseeing the day-to-day operations and financial performance of the Debtors. Consequently, I am involved in supervising all aspects of the Debtors' financial and business affairs.

2.    The facts stated herein are within my personal knowledge, and if called upon to testify to such facts I could and would testify competently thereto.

**The Debtors**.

3.    USDC, through its wholly owned subsidiaries[1] acquired in connection with its strategy to "rollup" the highly fragmented dry cleaning industry, has become the largest owner and operator of dry cleaning stores in the country. The Debtors currently employ approximately 600 employees and own and operate 78 dry cleaning stores generating in excess of $25 million in annual revenues. USDC, a publicly-traded Delaware corporation (UDRY.PK), is headquartered in Newport Beach, California.

4.    The Debtors' business model is based on acquiring market dominant dry cleaning chains, improving efficiencies, refranchising and converting their stores into full service garment care retail stores. The Debtors' operational efficiencies are based, in large part, upon their development and implementation of an environmentally green centralized processing "hub and

---

[1] USDC is the parent company of the following jointly administered debtors: Tuchman, which owns and operates 25 stores in Indianapolis; Portsmouth, which owns and operates 10 stores in Virginia; Fresno, which owns and operates 10 stores in Fresno, California and 2 in Arizona; Fresno 2, Inc., which owns and operates 7 stores in Fresno, California; Club Sub, which owns and operates 7 stores in the Inland Empire in California; and Steam Press, which is the parent company of Enivel, which owns and operates 16 stores in Hawaii. USDC is also the parent company of the following non-debtor entities: US Dry Cleaning Franchise Corporation, which has no assets or operations and is intended to serve as the franchisor for the Debtors' operations once they begin to refranchise their stores; and USDCC CVR Merger Sub, LLC, which used to own and operate stores in Palm Springs, but no longer has any assets or operations.

1   spoke" model, where the hub is the sole dry cleaning plant for a geographically convenient group

2   of stores. This model enables the Debtors to produce a superior and more efficient cleaning

3   process for all stores. The hub and spoke model removes the actual processing of garments from

4   the retail stores, which allows the stores to focus entirely on customer service and building

5   revenue. Once the Debtors have improved the operational efficiencies, they intend to refranchise

6   the stores, which will convert the currently company owned stores into franchised stores. This

7   franchising opportunity offers franchisees the benefit of a turn key operation with an already

8   existing strong reputation in the community and a verifiable history of profits. Also critical to the

9   Debtors' business strategy, will be an expansion of the product and service offering to customers

10   to include full garment care such as repair and tailoring.

11         **Secured Claims**.

12         5.      Attached hereto as Exhibit "2" and incorporated herein by this reference is a

13   schedule of creditors who assert secured claims against the Debtors' estates, along with the

14   amount of such claims according to the Debtors' books and records. Attached hereto as

15   Exhibit "3" is a schedule of estimated balances for cash, inventory and accounts receivable for

16   each of the Debtors as of the Petition Date.

17         **Events Precipitating The Debtors' Financial Difficulties and Efforts to Reorganize**.

18         6.      USDC was founded in 2005 to consolidate the highly fragmented dry cleaning

19   industry. This rollup strategy requires significant capital for costs of acquisitions and assimilation

20   of centralized processing hubs into the stores' operations. The Debtors grew rapidly from

21   2006-2008, meeting their revenue and cash flow projections, and growing from 200 to

22   600 employees. In order to continue to implement their business strategy and finance their

23   operations and growth, in 2007, the Debtors' parent went public to obtain additional financing.

24   The Debtors' business model, operations and success was dependent upon the Debtors' ability to

25   access and obtain financing from the capital markets. Unfortunately, significant and critical debt

26   and equity financing that was expected became unavailable in light of the negative impact upon

27   and freezing of the capital markets caused by the economic turmoil, which occurred in October

28   2008. Consequently, the Debtors were forced to internally finance their operations through their

1   own working capital.  The internal working capital alone, however, was not sufficient to finance
2   the Debtors' business, particularly given the significant debt amassed as a result of the
3   acquisitions and the model on which the Debtors had built their business and infrastructure,
4   including the timely and costly compliance with operating a publicly-traded company.  Making
5   matters worse, the Debtors are currently being denied access and control over their 17 store
6   operation in Fresno by a management company overseeing such operation.  This has further
7   negatively impacted the Debtors' cash flow and ability to meet their obligations.

8        7.      Based on the foregoing, the Debtors have been late paying rent to many of their
9   landlords, resulting in receipt of many notices to pay rent or quit.  In addition, many of the private
10  or personal loans used to finance the Debtors' operations are now becoming due.

11       8.      In an effort to address their financial difficulties, prior to filing for Chapter 11, the
12  Debtors took the following steps to reduce overhead:  (1) eliminated all investor relations activity,
13  resulting in annual savings of approximately $480,000; (2) eliminated legal and accounting
14  relating to stock support, resulting in annual savings of approximately $600,000; (3) reduced
15  levels of senior management and staff to minimal levels, resulting in annual savings of
16  approximately $1,240,000; and (4) eliminated assimilation consultants (senior management
17  absorbed the work), resulting in annual savings of approximately $700,000.  In addition, the
18  Debtors significantly improved their debt structure, resulting in, among other things, less interest
19  expense, by converting $7,000,000 of debt into equity.  As a further improvement to cash flow,
20  the Debtors' senior management deferred compensation to aid the Debtors' operations.

21       9.      The Debtors are continuing to identify ways to increase revenues and sell
22  franchises.  Unfortunately, much of the Debtors' success is dependent upon capital freeing up in
23  the markets.  While the Debtors' actions will be instrumental in their efforts to reorganize, they
24  are not sufficient to resolve the Debtors' financial problems.  Consequently, in order to preserve
25  their stores and overall operation, on March 4, 2010 ("Petition Date"), the Debtors filed voluntary
26  petitions under Chapter 11 of the Bankruptcy Code.

27

28

MAINDOCS-#141104-v1-Envel_Lee_Decl_FirstDayMotions.DOC

**Cash Collateral**.

10.     The preservation of the value of the Debtors' estates and the success of these Chapter 11 cases depend upon the Debtors' ability to obtain funds necessary to maintain the Debtors' operations. To do so, the Debtors must be able to meet, without interruption, their cash needs for post-petition purposes, fulfill their current customer orders, and pay other operational expenses incurred in the ordinary course of their business. Since the Debtors have been unable to secure financing, the use of cash collateral is critical to maximizing the return for the Debtors' creditors. Conversely, if the Debtors are not allowed to use the cash collateral, the Debtors will be forced to either dismiss this proceeding or convert it to a Chapter 7 proceeding (and liquidate their assets), resulting in much lower returns to the Debtors' creditors.

11.     The Debtors propose to use funds claimed as cash collateral by the Secured Creditors in connection with the continued operation of the Debtors' business, in accordance with the provisions of the Debtors' cash collateral motion and Budgets attached hereto as Exhibit "1."

12.     Based upon the Budgets set forth on Exhibit "1," I believe that this Court should authorize the Debtors' continued use of cash collateral in connection with their ongoing business operations. The Budgets indicate that the Debtors will operate on a cash flow positive basis during the budgeted period, and that their assets will increase in value during such period.

13.     I believe that the Debtors' projections of their business operations as set forth in the Budgets are reasonable. The business assumptions underlying the operations projected in the Budgets are essentially in accordance with the Debtors' historical experience, as adjusted to take into account recent or projected events (e.g., the recent downturn in the economy). Accordingly, I believe that the budgets establish that the proposed replacement liens being granted to each of the Secured Creditors will adequately protect the Lenders' alleged interests.

14.     A dry cleaning store generates revenue primarily from the delivery of services. The cost of the Debtors' inventory generally constitutes approximately 4-6 % of the Debtors' sales. The value of this collateral pool and the proceeds thereof is very limited, as illustrated in Exhibit "3" and sufficient replacement collateral will be generated through the Debtors' post-

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions.DOC

1   petition operations in order to provide to the Secured Creditors adequate protection of their

2   interests therein.

3       15.     Here, even a temporary cessation of the Debtors' ability to operate their business,

4   caused by any lack of access to any cash collateral, will result in a substantial diminution of the

5   Secured Creditors' collateral, as customers will turn to competitors of the Debtors' for their dry

6   cleaning needs, resulting in thereby impairing the Debtors' business and increasing the likelihood

7   of a liquidation of the Debtors' business. In contrast, as shown in the Budgets, Debtors' ongoing

8   operations will preserve the value of the Secured Creditors' interests in any cash collateral, thus

9   providing adequate protection.

10      **Contract Rejection and Turnover**.

11      16.     In or about February 2008, USDC purchased 19 dry cleaning stores located in the

12  Fresno, California area and Arizona (collectively, the "Fresno Business") from Team Equipment,

13  Inc. ("Team"), Bell Hop Cleaners of California, Inc. ("Bell Hop"), Fabricare Services, Inc.

14  ("Fabricare") and Team Enterprises, Inc. ("Team Enterprises"). The purchase of dry cleaning

15  stores was made pursuant to a Purchase Agreement that was entered into on or about August 30,

16  2007. Pursuant to the terms of the Purchase Agreement, USDC paid approximately $1,700,000

17  cash, issued Team Enterprises common stock in USDC, and issued promissory notes in favor of

18  Team and Bell Hop in the principal aggregate amount of $1,650,867. Fresno and Fresno 2, the

19  wholly owned subsidiaries of USDC, own and operate the Fresno Business.

20      17.     On or about February 15, 2008, Fresno entered into an Employment Agreement

21  with Tom Jones ("Jones"), whereby Jones was to serve as District President for the Fresno

22  Business[2]. Jones was one of the principals of Team, Bell Hop, Fabricare and Team Enterprises

23  prior to their sale to USDC.

24      18.     In or about April, 2009, Team and Bell Hop declared a default of the terms of the

25  note. On or about December 7, 2009, the Debtors resolved the dispute over the alleged default on

26  the note by entering into the Master Agreement[3] with Gamet Enterprises, LLC. ("Gamet"),

27

28
_____
[2] A true and correct copy of the Employment Agreement is attached hereto as Exhibit "4."
[3] A true and correct copy of the Master Agreement is attached hereto as Exhibit "5."

MAINDOCS-#141104-v1-Envel_Lee_Decl_FirstDayMotions.DOC

1  Bellhop, and Team[4], as well as the Management and Operating Agreement[5] with Gamet.  These

2  agreements provide for, among other things, that Gamet will oversee and manage all aspects of

3  the Fresno Business.  In light of recent events, as described more particularly below, among other

4  reasons, the Debtors need to reject the agreements and regain control and possession of the Fresno

5  Business.

6       19.    On February 9, 2010, Team, Bell Hop, and Gamet asserted that USDC was in

7  default with regard to the various notes issued in connection with the original purchase and sale.

8  Continuing from February 9, 2010 until present, Jones has directed employees of Fresno and

9  Fresno 2 to prevent a USDC representative physical access to the subject stores, closed the

10  Debtors' bank accounts over which Team, Bell Hop, Gamet and/or Jones (collectively, the

11  "Custodians") had control, has shut down or circumvented USDC credit card swiping machines,

12  directed employees to not deposit any monies received from the Fresno Business, prevented

13  principals of USDC from accessing the physical stores, and otherwise completely prevented any

14  and all physical or financial access to the Fresno Business.

15       20.    On February 12, 2010, Fresno terminated Jones's employment and the

16  Employment Agreement.[6]  Unfortunately, notwithstanding the Debtors' efforts, the Custodians

17  refuse to provide the Debtors access or control over the Debtors' money or the Fresno Business.

18  More particularly, on or about February 9, 2010, USDC discovered that Jones withdrew all of the

19  monies available in the operating accounts of Fresno and Fresno 2.  USDC also discovered that a

20  deposit generated from the Fresno Business in the amount of $69,372.82 was made directly into

21  the account of Team, dba Gamet[7].

22       21.    On or about that same day, USDC learned that Jones directed Amber Sylvester to

23  send an email[8] via the "SPOT" system to all store managers of Fresno, directing each manager as

24  follows:

25

26  [4] Team, Bellhop, and Gamet are entities that are wholly owned by Jones and members of his immediate family
    [5] A true and correct copy of the Management and Operating Agreement is attached hereto as Exhibit "6."

27  [6] While I do not believe that the Employment Agreement is executory, and thus not necessary to reject, out of caution,
    the Debtors seek rejection of the Employment Agreement.

28  [7] A true and correct copy of the withdrawal slips signed by Jones and deposit receipt are attached hereto collectively
    as Exhibit "7" and incorporated herein by this reference.
    [8] A true and correct copy of this email is attached hereto as Exhibit "8" and incorporated herein by this reference.

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions.DOC

1
2
3
4

> "Please get all of your bank deposit books, USDC check stampers and the metal plate of the manual credit card slider. We are changing accounts so this is very important you get this together ASAP!!!!! Give to shyanne when she comes to your store... NO bank deposit till you hear from me or Carmen.... Also Stop Stamping checks....."

5
6
7
8
9

22.     On or about February 13, 2010, Jones sent another email to all District personnel directing them as follows: "If any US Dry Cleaning Personnel come into a location, please be polite but do not follow any of their instructions. Ask them to leave as they are not authorized to be in the location." This email[9] further stated, "... Because of recent events we have been forced to ask for a court injunction against them, which is set for this Tuesday at 3:30 p.m."

10
11
12
13

23.     On or about February 12, 2010, Jones wrote to other principals of USDC stating: "It was reported to me that there were a number of comments that you are going to attempt to change the locks on locations. Please be aware that all of the police departments have been notified and will be patrolling the locations from Fresno to Modesto."[10]

14
15
16
17
18
19
20

24.     The Management Agreement and the Employment Agreement are no longer beneficial and in fact are detrimental and prejudicial to the Debtors' reorganization efforts. Team, Bellhop, Garnet and Jones have deprived and continue to deprive the Debtors access to and use of the Debtors' cash and their Fresno Business. The Debtors' overall operation needs to control the Fresno Business and all of their cash in order to sustain their operation. Accordingly, it is necessary that there contracts be rejected immediately and the Custodians be compelled to turnover this property of the estate.

21
22
23
24
25
26

25.     As set forth above, operating under the Management Agreements, the Custodians have siphoned cash away from the Debtors' bank accounts and are depriving the Debtors from all access to and control over the Fresno Business and all of its earned cash. Consequently, in order to retake control over the Fresno Business and its cash to enable the Debtors' to fund its overall operations, the Debtors need to reject the Management Agreements. Failure to control and use the funds generated by these stores is particularly detrimental to the Debtors at this time, as it is short

27
28

---

[9] A true and correct copy of the February 13, 2010 email is attached hereto as Exhibit "9" and incorporated herein by this reference.
[10] A true and correct copy of this correspondence is attached hereto as Exhibit "10" and incorporated herein by this reference.

MAINDOCS-#141104-v1-Envnel_Lee_Decl_FirstDayMotions.DOC

1   on cash and cannot afford to continue operations without the revenues generated from these

2   stores. Accordingly, I believe it is in the best interests of the estates to reject the Management

3   Agreements immediately.

4        26.    The Debtors, Team, Bell Hop, and Gamet have been engaged in litigation over the

5   Management Agreements. To the extent the Debtors' intentions regarding the Management

6   Agreements were not clear by virtue of the litigation, I, on behalf of the Debtors, hereby

7   unequivocally express their intention to reject the Management Agreements.

8        27.    The Debtors own 100% of the legal and equitable interests in the Fresno Business.

9        28.    Team, Bell Hop, Gamet and Jones are in physical possession of and control over

10  the Debtors' Fresno Business, as well as funds that they transferred into their own bank

11  account(s). I believe that these funds are being held in the name of Team, Bell Hop, and/or

12  Gamet at Bank of America.

13  **Payroll**.

14       29.    The Debtors seeks authority to pay these pre-petition wages and salaries as

15  follows:

| TYPE OF EMPLOYEE | PRE-PETITION PERIOD | PAYMENT DUE DATE | AMOUNT |
|---|---|---|---|
| Management | 2/1/10 - 2/28/10<br>3/1/10 – 3/3/10 | 2/28/10<br>3/15/10 | $33,125[11]<br>$7,898 |
| Non-management employees employed by Portsmouth | 2/15/10 – 2/28/10<br>3/1/10 – 3/3/10 | 3/5/10<br>3/19/10 | $66,323<br>$9,948 |
| All other non-management employees | 2/22/10 – 2/28/10<br>3/1/10 – 3/3/10 | 3/5/10<br>3/12/10 | $132,332<br>$39,699 |

22       30.    The pre-petition compensation amounts includes compensation to two insiders in

23  these cases, but <u>no</u> payments will be made to the insiders until such time as the Debtors' post-

24  petition compensation is authorized to be paid pursuant to the U.S. Trustee Guidelines. The only

25  employee who is owed for compensation in an amount greater than the $10,950 wage priority

26  limit provided for in Section 507(a) of the Bankruptcy Code is Mr. Lee, the Debtor's president;

27  however, Mr. Lee will not be paid more than $10,950 for the compensation owed to him.

28  ---
[11] $3,125 of this amount is owed to one employee for the period 2/1/10-2/28/10. The rest of this amount is for payroll for the period 2/16/10-2/28/10.

1     31.    The Debtors also seek to reimburse Mr. Lee and Robert Boland an aggregate of not

2 more than $15,000 for ordinary course pre-petition business expenses that they incurred and paid

3 in connection with the Debtors' business operations.

4     32.    The Debtors' businesses are dependent upon their labor. If these employees are

5 not paid, they will most likely cease working and seek employment elsewhere. Any such

6 disruption would have a devastating effect upon the Debtors' businesses and consequential value

7 to the creditors. In contrast, if the Debtors obtain the relief sought herein its business operation

8 will continue in the ordinary course, customer needs will be met, and the overall value of the

9 Debtors' business enterprises will be preserved for creditors.

10 **Utilities**.

11     33.    In the ordinary course of business, the Debtors use gas, water, electric,

12 telecommunications and other services provided by various utility companies (collectively, the

13 "Utility Providers"). The continued and uninterrupted utility service is essential to the Debtors'

14 ability to sustain their operations during their Chapter 11 cases. Any interruption of utility

15 service would severely disrupt the Debtors' business operations. Prior to the Petition Date, the

16 Debtors generally paid the Utility Providers' bills consistently and on a regular basis. The

17 Debtors estimate that their average monthly payments to their Utility Providers aggregates

18 approximately $72,078.

19     34.    To continue day-to-day operations in the most cost-effective manner, the Debtors

20 must ensure that there is no interruption of utility services. Since the Debtors cannot continue

21 their business operations without utility services, I believe that it is critical that the Debtors

22 obtain emergency authorization for the relief requested herein and further relief as is just and

23 appropriate under the circumstances in these cases.

24 **Limit Notice**.

25     35.    The Debtors have an aggregate of approximately 700 creditors. Some of the

26 motions and applications that may be filed in the Debtors' cases will involve matters that

27 ordinarily fall within the parameters of notices required to be given to all creditors in the

28 Debtors' cases, but which will not affect directly, or impact the interests of, a majority of

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions.DOC

1    creditors. The Debtors contend that providing notice to all such parties would be overly

2    burdensome and costly to their estates.

3        36.    I believe that adoption of this proposed notice procedure as set forth in the limit

4    notice motion, after notice and the opportunity for a hearing, is necessary and appropriate. Such

5    notice procedure will relieve the Debtors of the significant administrative burdens that would be

6    associated with periodic "mass mailings," and would reduce substantially the Debtors' postage

7    and reproduction costs, as well as the time spent by attorneys and/or paralegals, thereby

8    facilitating significantly the economical and efficient administration of the Debtors' cases.

9        I declare under penalty of perjury under the laws of the United States of America and the

10   State of California that the foregoing is true and correct.

11   Executed this 5th day of March 2010, at Newport Beach, California.

12

13                                                              _____
                                                                      Robert Y. Lee

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions (2)

# EXHIBIT "1"

# 13 Week Forecast  USDC Consolidated

| Week Ending | 1 3/10 | 2 3/17 | 3 3/24 | 4 3/31 | 5 4/7 | 6 4/14 | 7 4/21 | 8 4/28 | 9 5/5 | 10 5/12 | 11 5/19 | 12 5/26 | 13 6/2 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 401,100 | 392,900 | 474,600 | 451,100 | 427,500 | 457,500 | 531,300 | 514,100 | 451,800 | 464,400 | 459,700 | 522,200 | 511,400 | 6,069,700 |
| Less Returns / Claims | (2,037) | (2,075) | (2,081) | (3,593) | (2,173) | (2,220) | (2,144) | (2,198) | (2,247) | (3,755) | (2,206) | (2,239) | (2,185) | (31,210) |
| Cash AR Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Income | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 64,350 |
| Other Cash in | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Receipts | 404,014 | 395,776 | 477,470 | 452,457 | 430,278 | 460,230 | 534,106 | 516,852 | 454,603 | 465,596 | 452,384 | 524,912 | 514,165 | 6,092,841 |
| | | | | | | | | | | | | | | |
| CGS Supplies | 19,809 | 20,217 | 47,313 | 27,513 | 20,490 | 21,220 | 20,004 | 47,868 | 28,277 | 21,367 | 21,581 | 48,147 | 27,277 | 370,877 |
| Payroll - Insiders | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll - Admin | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | 8,200 | 8,200 | 8,200 | 8,200 | 8,200 | 105,800 |
| Payroll - Store | 232,107 | 205,179 | 205,679 | 212,195 | 207,945 | 212,689 | 211,899 | 212,681 | 218,931 | 218,317 | 221,317 | 221,430 | 223,430 | 2,803,607 |
| Payroll - Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Taxes (Itemize) | 1,500 | 1,500 | 2,860 | 5,320 | 1,530 | 1,500 | 2,960 | 5,320 | 1,000 | - | - | 1,390 | 3,820 | 28,540 |
| Rent Expense - Real Property | | | | | 220,000 | 85,000 | | | 227,000 | 88,000 | | | | 620,600 |
| Lease Expense - Personal Property | 2,311 | 725 | 725 | 725 | 10,325 | 725 | 2,311 | 725 | 10,325 | 725 | 725 | 2,311 | 725 | 33,383 |
| Insurance | 18,800 | 20,472 | 10,600 | 23,150 | 13,912 | 5,813 | 7,563 | 41,563 | 28,047 | 5,925 | 26,775 | 25,247 | 5,925 | 233,790 |
| Real Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone and Utilities | 7,002 | 7,420 | 14,696 | 14,823 | 15,448 | 30,017 | 47,174 | 24,905 | 24,653 | 26,566 | 45,827 | 24,527 | 22,830 | 305,905 |
| Repairs and Maintenance | 4,600 | 11,675 | 6,600 | 14,400 | 6,675 | 4,175 | 11,850 | 14,475 | 4,750 | 10,625 | 7,750 | 8,300 | 8,150 | 114,025 |
| Travel and Entertainment (Itemize) | | 2,000 | | | | | 500 | | | | | 500 | | 3,000 |
| Misc Expense - Outside Services | 7,600 | 10,900 | 13,600 | 7,600 | 7,600 | 18,262 | 9,400 | 13,600 | 7,600 | 8,900 | 13,600 | 18,762 | 7,600 | 145,024 |
| Misc Expense - Office | 13,900 | 8,041 | 6,100 | 3,000 | 13,400 | 2,850 | 4,300 | 3,000 | 14,200 | 2,850 | 2,600 | 4,300 | 3,600 | 81,941 |
| Misc Expense - Automobile | 5,725 | 10,862 | 7,125 | 8,025 | 6,100 | 8,100 | 8,200 | 11,237 | 5,825 | 7,825 | 7,925 | 7,825 | 8,962 | 103,736 |
| Misc Expense - Credit Card Fees | 16,904 | 1,800 | 1,800 | 7,800 | 16,875 | 1,875 | 1,875 | 7,875 | 1,950 | 1,950 | 16,950 | 1,950 | 7,950 | 87,554 |
| Misc Expense - Advertising | 12,875 | 7,527 | 20,401 | 7,601 | 13,519 | 12,009 | 7,205 | 11,921 | 13,117 | 7,547 | 10,593 | 7,483 | 7,267 | 145,065 |
| Corporate G & A | 30,900 | 30,900 | 30,500 | 30,800 | 30,900 | 30,900 | 30,300 | 30,900 | 30,900 | 30,900 | 30,900 | 30,900 | 30,900 | 401,700 |
| Net Gain on Sale of Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operating Income | | | | | | | | 13,000 | | | | | | 13,000 |
| UST Fees | | | | | | | | | | | | | 3,000 | 3,000 |
| Legal and Professional | | | | | 75,000 | | | | | 75,000 | | | 75,000 | 225,000 |
| Deposits | | | | | 72,000 | | | | | | | | | 72,000 |
| Total Outlays | 381,933 | 347,317 | 376,489 | 371,152 | 739,758 | 443,245 | 373,941 | 447,169 | 625,375 | 514,566 | 420,743 | 411,236 | 441,635 | 5,894,547 |
| | | | | | | | | | | | | | | |
| Net Change in Cash | 22,081 | 48,459 | 100,981 | 81,306 | (309,481) | 16,986 | 160,166 | 69,683 | (170,772) | (48,961) | 41,641 | 113,676 | 72,530 | 198,294 |
| Plus: Beginning Cash | 82,846 | 104,927 | 153,386 | 254,367 | 335,672 | 26,192 | 43,177 | 203,343 | 273,026 | 102,254 | 53,293 | 94,934 | 208,610 | 82,846 |
| Ending Cash Balance | 104,927 | 153,386 | 254,367 | 335,672 | 26,192 | 43,177 | 203,343 | 273,026 | 102,254 | 53,293 | 94,934 | 208,610 | 281,140 | 281,140 |

**13 Week Forecast**  Enivel

| Week Ending | 1<br>3/10 | 2<br>3/17 | 3<br>3/24 | 4<br>3/31 | 5<br>4/7 | 6<br>4/14 | 7<br>4/21 | 8<br>4/28 | 9<br>5/5 | 10<br>5/12 | 11<br>5/19 | 12<br>5/26 | 13<br>6/2 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 93,800 | 78,000 | 158,500 | 132,500 | 98,000 | 81,000 | 170,000 | 142,000 | 76,000 | 81,000 | 74,000 | 142,000 | 142,000 | 1,467,800 |
| Less: Returns / Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash AR Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Cash in | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Receipts | 93,800 | 78,000 | 158,500 | 132,500 | 98,000 | 81,000 | 170,000 | 142,000 | 75,000 | 81,000 | 74,000 | 142,000 | 142,000 | 1,467,800 |
| COS Supplies | 6,550 | 6,550 | 6,550 | 6,550 | 5,700 | 5,700 | 5,700 | 5,700 | 5,800 | 5,800 | 5,800 | 5,800 | 5,800 | 78,000 |
| Payroll - Insiders | | | | | | | | | | | | | | |
| Payroll - Admin | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 90,200 |
| Payroll - Store | 52,800 | 52,800 | 52,800 | 52,800 | 51,000 | 51,000 | 51,000 | 51,000 | 51,700 | 51,700 | 51,700 | 51,700 | 51,700 | 673,700 |
| Payroll Taxes | | | | | | | | | | | | | | |
| Other Taxes (Itemize) | | | | | | | | | | | | | | |
| Rent Expense - Real Property | | | | | 76,000 | | | | 83,000 | | | | | 159,000 |
| Lease Expense - Personal Property | | | | | 9,600 | | | | 9,600 | | | | | 19,200 |
| Insurance | 1,150 | 1,150 | 6,700 | 1,150 | 4,500 | 1,750 | 3,500 | 1,750 | 4,500 | 1,700 | 4,900 | 1,700 | 1,700 | 36,150 |
| Real Property Taxes | | | | | | | | | | | | | | |
| Telephone and Utilities | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 24,000 | 3,000 | 3,800 | 3,800 | 21,000 | 3,800 | 3,800 | 83,000 |
| Repairs and Maintenance | 1,800 | 4,500 | 1,800 | 6,700 | 2,300 | 2,300 | 4,100 | 7,200 | 2,800 | 2,800 | 2,800 | 2,800 | 2,900 | 44,700 |
| Travel and Entertainment (Itemize) | | | | | | | | | | | | | | |
| Misc Expense - Outside Services | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 4,600 | 59,800 |
| Misc Expense - Office | 1,900 | 900 | 2,400 | 900 | 1,900 | 900 | 2,400 | 900 | 1,700 | 700 | 700 | 2,200 | 700 | 18,200 |
| Misc Expense - Automobile | 1,900 | 1,900 | 1,900 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 1,850 | 1,850 | 1,850 | 1,850 | 1,850 | 25,950 |
| Misc Expense - Credit Card Fees | | | | | | | | | | | | | | |
| Misc Expense - Advertising | 6,000 | 500 | 9,500 | 500 | 6,200 | 4,500 | | 4,500 | 5,800 | | 3,000 | | | 46,300 |
| Corporate G & A | | | | | | | | | | | | | | |
| Net Gain on Sale of Assets | | | | | | | | | | | | | | |
| Other Non-Operating Income | | | | | | | | | | | | | | |
| UST Fees | | | | | | | | | | | | | | |
| Legal and Professional | | | | | | | | | | | | | | |
| Deposits | | | | | | | | | | | | | | |
| Total Outlays | 86,900 | 83,100 | 96,450 | 85,600 | 174,200 | 83,160 | 104,400 | 87,750 | 182,550 | 79,950 | 109,350 | 81,450 | 79,950 | 1,334,800 |
| Net Change in Cash | 6,900 | (5,100) | 62,050 | 46,900 | (76,200) | (2,150) | 65,600 | 54,250 | (107,550) | 1,050 | (35,350) | 60,550 | 62,050 | 133,000 |
| Plus: Beginning Cash | | 6,900 | 1,800 | 63,850 | 110,750 | 34,550 | 32,400 | 98,000 | 152,250 | 44,700 | 45,750 | 10,400 | 70,950 | - |
| Ending Cash Balance | 6,900 | 1,800 | 63,850 | 110,750 | 34,550 | 32,400 | 98,000 | 152,250 | 44,700 | 45,750 | 10,400 | 70,950 | 133,000 | 133,000 |

# 13 Week Forecast    USDC Tuchman

| Week Ending | 1 (3/10) | 2 (3/17) | 3 (3/24) | 4 (3/31) | 5 (4/7) | 6 (4/14) | 7 (4/21) | 8 (4/28) | 9 (5/5) | 10 (5/12) | 11 (5/19) | 12 (5/26) | 13 (6/2) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 157,500 | 157,500 | 157,500 | 157,500 | 162,500 | 162,500 | 162,500 | 162,500 | 1,880,000 |
| Less: Returns / Claims | (500) | (500) | (500) | (2,000) | (500) | (500) | (500) | (500) | (500) | (2,000) | (500) | (500) | (500) | (9,500) |
| Cash AR Collections |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Other Operating Income |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Other Cash in |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Total Cash Receipts | 119,500 | 119,500 | 119,500 | 118,000 | 119,500 | 157,000 | 157,000 | 157,000 | 157,000 | 160,500 | 162,000 | 162,000 | 162,000 | 1,870,500 |
| CGS Supplies |  | 27,000 |  | 7,000 |  |  |  | 27,000 | 7,000 |  |  | 27,000 | 7,000 | 109,000 |
| Payroll - Insiders |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Payroll - Admin |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Payroll - Store | 58,000 | 59,500 | 60,000 | 64,000 | 59,000 | 56,000 | 58,000 | 61,000 | 64,000 | 61,000 | 64,000 | 64,000 | 66,000 | 797,500 |
| Payroll Taxes |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Other Taxes (Itemize) | 1,500 | 1,500 | 2,860 | 5,320 | 1,500 | 1,500 | 2,860 | 5,320 | 1,000 |  |  | 1,380 | 3,820 | 28,540 |
| Rent Expense - Real Property |  |  |  |  |  | 85,000 |  |  |  | 88,000 |  |  |  | 173,000 |
| Lease Expense - Personal Property | 1,586 |  |  |  |  | 1,586 |  |  |  |  |  | 1,586 |  | 4,758 |
| Insurance | 17,650 | 19,322 |  |  |  |  |  | 17,650 | 19,322 |  | 17,650 | 19,322 |  | 110,916 |
| Real Property Taxes |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Telephone and Utilities |  |  |  |  |  | 14,047 | 11,340 | 9,477 | 8,136 | 9,698 | 11,901 | 8,103 | 7,000 | 80,000 |
| Repairs and Maintenance (Itemize) | 1,000 | 5,375 | 3,000 | 3,500 | 2,500 | 5,875 | 5,875 | 3,000 |  |  | 3,000 | 3,550 |  | 36,675 |
| Travel and Entertainment (Itemize) |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Misc Expense - Outside Services |  | 1,300 | 6,000 |  |  | 10,662 | 1,300 | 6,000 |  | 1,300 | 6,000 | 10,662 |  | 43,224 |
| Misc Expense - Office | 2,000 | 5,741 | 2,300 | 700 | 500 | 550 | 500 | 700 | 1,500 | 550 | 500 | 700 | 1,500 | 17,741 |
| Misc Expense - Automobile | 1,400 | 4,537 |  |  | 4,537 | 4,537 | 4,537 | 4,537 | 4,537 |  |  | 4,537 |  | 33,211 |
| Misc Expense - Credit Card Fees | 15,104 |  |  |  | 15,000 |  |  |  |  |  | 15,000 |  |  | 45,104 |
| Misc Expense - Advertising | 3,129 | 3,129 | 6,979 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 3,129 | 44,527 |
| Corporate G & A |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Net Gain on Sale of Assets |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Other Non-Operating Income |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| UST Fees |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Legal and Professional |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Deposits |  |  |  |  |  |  |  |  |  |  |  |  |  | - |
| Total Outlays | 101,369 | 100,404 | 110,939 | 85,049 | 83,029 | 175,288 | 88,090 | 137,813 | 105,487 | 171,250 | 124,680 | 140,812 | 92,986 | 1,517,196 |
| Net Change in Cash | 18,131 | 19,096 | 8,561 | 32,951 | 36,471 | (18,288) | 68,910 | 19,187 | 51,513 | (10,750) | 37,320 | 21,188 | 69,014 | 353,304 |
| Plus: Beginning Cash |  | 18,131 | 37,227 | 45,788 | 78,739 | 115,210 | 96,922 | 165,832 | 185,019 | 236,532 | 225,782 | 263,102 | 284,290 | - |
| Ending Cash Balance | 18,131 | 37,227 | 45,788 | 78,739 | 115,210 | 96,922 | 165,832 | 185,019 | 236,532 | 225,782 | 263,102 | 284,290 | 353,304 | 353,304 |

## 13 Week Forecast    USDC Portsmouth

| Week Ending | 1 3/10 | 2 3/17 | 3 3/24 | 4 3/31 | 5 4/7 | 6 4/14 | 7 4/21 | 8 4/28 | 9 5/5 | 10 5/12 | 11 5/19 | 12 5/26 | 13 6/2 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 67,300 | 74,900 | 76,100 | 78,600 | 84,600 | 94,000 | 78,800 | 89,600 | 89,400 | 90,900 | 93,200 | 87,700 | 76,900 | 1,081,900 |
| Less: Returns / Claims | (337) | (375) | (381) | (393) | (423) | (470) | (394) | (448) | (447) | (455) | (466) | (439) | (385) | (5,410) |
| Cash AR Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Cash in | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | 66,964 | 74,526 | 75,720 | 78,207 | 84,078 | 93,530 | 78,406 | 89,152 | 88,953 | 90,446 | 92,734 | 87,262 | 76,516 | 1,076,491 |
| CGS Supplies | 5,384 | 5,992 | 6,088 | 6,288 | 6,760 | 7,520 | 6,304 | 7,168 | 7,152 | 7,272 | 7,456 | 7,016 | 6,152 | 86,552 |
| Payroll - Insiders | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll - Admin | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 15,600 |
| Payroll - Store | 56,857 | 28,429 | 28,429 | 30,945 | 30,945 | 35,699 | 35,699 | 33,681 | 33,681 | 36,067 | 36,067 | 36,180 | 36,180 | 458,857 |
| Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Taxes (Itemize) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent Expense - Real Property | - | - | - | - | 56,000 | - | - | - | 56,000 | - | - | - | - | 112,000 |
| Lease Expense - Personal Property | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 725 | 9,425 |
| Insurance | - | - | - | 18,100 | 5,349 | - | - | 18,100 | - | - | - | - | - | 41,549 |
| Real Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone and Utilities | 3,702 | 4,120 | 4,186 | 4,323 | 4,648 | 5,170 | 4,334 | 4,928 | 4,917 | 5,000 | 5,128 | 4,824 | 4,230 | 59,505 |
| Repairs and Maintenance | - | - | - | 2,400 | - | - | - | 2,400 | - | - | - | - | 3,400 | 8,200 |
| Travel and Entertainment (Itemize) | - | - | - | - | - | - | 500 | - | - | - | 500 | 500 | - | 3,000 |
| Misc Expense - Outside Services | 2,000 | 2,000 | - | - | - | - | - | - | - | - | - | - | - | 3,000 |
| Misc Expense - Office | 8,600 | - | - | - | 8,600 | - | - | - | 8,600 | - | - | - | - | 25,800 |
| Misc Expense - Automobile | - | 2,000 | - | 2,000 | - | 2,000 | - | 2,000 | - | 2,000 | - | 2,000 | - | 12,000 |
| Misc Expense - Credit Card Fees | - | - | - | 6,000 | - | - | - | 6,000 | - | - | - | - | 6,000 | 18,000 |
| Misc Expense - Advertising | 1,346 | 1,498 | 1,522 | 1,572 | 1,690 | 1,880 | 1,576 | 1,792 | 1,788 | 1,818 | 1,864 | 1,754 | 1,538 | 21,638 |
| Corporate G & A | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Gain on Sale of Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal and Professional | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Outlays** | 77,814 | 47,963 | 42,150 | 73,553 | 115,917 | 54,194 | 50,838 | 77,994 | 114,063 | 54,081 | 52,438 | 54,699 | 59,425 | 875,126 |
| Net Change in Cash | (10,850) | 26,563 | 33,570 | 4,655 | (31,839) | 39,336 | 27,568 | 11,159 | (25,110) | 36,365 | 40,296 | 32,563 | 17,091 | 201,365 |
| Plus: Beginning Cash | - | (10,850) | 15,713 | 49,283 | 53,937 | 22,098 | 61,434 | 89,002 | 100,181 | 75,051 | 111,415 | 151,711 | 184,274 | - |
| Ending Cash Balance | (10,850) | 15,713 | 49,283 | 53,937 | 22,098 | 61,434 | 89,002 | 100,161 | 75,051 | 111,415 | 151,711 | 184,274 | 201,365 | 201,365 |

16

## 13 Week Forecast       USDC Fresno

| Week Ending | 1 3/10 | 2 3/17 | 3 3/24 | 4 3/31 | 5 4/7 | 6 4/14 | 7 4/21 | 8 4/28 | 9 5/5 | 10 5/12 | 11 5/19 | 12 5/26 | 13 6/2 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 95,000 | 95,000 | 95,000 | 95,000 | 100,000 | 100,000 | 100,000 | 100,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 1,305,000 |
| Less: Returns / Claims | (950) | (950) | (950) | (950) | (1,000) | (1,000) | (1,000) | (1,000) | (1,050) | (1,050) | (1,050) | (1,050) | (1,050) | (13,050) |
| Cash AR Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Cash In | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | 94,050 | 94,050 | 94,050 | 94,050 | 99,000 | 99,000 | 99,000 | 99,000 | 103,950 | 103,950 | 103,950 | 103,950 | 103,950 | 1,291,950 |
| | | | | | | | | | | | | | | |
| CGS Supplies | 6,175 | 6,175 | 6,175 | 6,175 | 6,500 | 6,500 | 6,500 | 6,500 | 6,825 | 6,825 | 6,825 | 6,825 | 6,825 | 84,825 |
| Payroll – Insiders | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll – Admin | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll – Store | 48,450 | 48,450 | 48,450 | 48,450 | 51,000 | 51,000 | 51,000 | 51,000 | 53,550 | 53,550 | 53,550 | 53,550 | 53,550 | 665,550 |
| Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Taxes (itemize) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent Expense – Real Property | - | - | - | - | 55,000 | - | - | - | 55,000 | - | - | - | - | 110,000 |
| Lease Expense – Personal Property | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | - | - | 3,088 | 3,088 | 3,250 | 3,250 | 3,250 | 3,250 | 3,413 | 3,413 | 3,413 | 3,413 | 3,413 | 36,238 |
| Real Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone and Utilities | - | - | 5,700 | 5,700 | 6,000 | 6,000 | 6,000 | 6,000 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 66,900 |
| Repairs and Maintenance | 1,425 | 1,425 | 1,425 | 1,425 | 1,500 | 1,500 | 1,500 | 1,500 | 1,575 | 1,575 | 1,575 | 1,575 | 1,575 | 19,575 |
| Travel and Entertainment (itemize) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc Expense – Outside Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc Expense – Office | 700 | 700 | 700 | 700 | 1,200 | 700 | 700 | 700 | 1,200 | 700 | 700 | 700 | 700 | 10,100 |
| Misc Expense – Automobile | 1,425 | 1,425 | 1,425 | 1,425 | 1,500 | 1,500 | 1,500 | 1,500 | 1,575 | 1,575 | 1,575 | 1,575 | 1,575 | 19,575 |
| Misc Expense – Credit Card Fees | 1,425 | 1,425 | 1,425 | 1,425 | 1,500 | 1,500 | 1,500 | 1,500 | 1,575 | 1,575 | 1,575 | 1,575 | 1,575 | 19,575 |
| Misc Expense – Advertising | 1,900 | 1,900 | 1,900 | 1,900 | 2,000 | 2,000 | 2,000 | 2,000 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 26,100 |
| Corporate G & A | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Gain on Sale of Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal and Professional | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Outlays** | 61,500 | 61,500 | 70,288 | 70,288 | 129,450 | 73,950 | 73,950 | 73,950 | 133,113 | 77,613 | 77,613 | 77,613 | 77,613 | 1,058,438 |
| | | | | | | | | | | | | | | |
| **Net Change in Cash** | 32,550 | 32,550 | 23,763 | 23,763 | (30,450) | 25,050 | 25,050 | 25,050 | (29,163) | 26,338 | 26,338 | 26,338 | 26,338 | 233,513 |
| **Plus: Beginning Cash** | - | 32,550 | 65,100 | 88,863 | 112,625 | 82,175 | 107,225 | 132,275 | 157,325 | 128,163 | 154,500 | 180,838 | 207,175 | |
| **Ending Cash Balance** | 32,550 | 65,100 | 88,863 | 112,625 | 82,175 | 107,225 | 132,275 | 157,325 | 128,163 | 154,500 | 180,838 | 207,175 | 233,513 | 233,513 |

Note: This budget includes operational performance for Fresno 2, as, pursuant to an agreement between these entities, Fresno collects all revenues generated and pays all expenses incurred by Fresno 2

# 13 Week Forecast   Cleaner's Club Sub

| Week Ending | 1 3/7 | 2 3/14 | 3 3/21 | 4 3/28 | 5 4/4 | 6 4/11 | 7 4/18 | 8 4/25 | 9 5/2 | 10 5/9 | 11 5/16 | 12 5/23 | 13 5/30 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Revenue | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 325,000 |
| Less: Returns / Claims | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (3,250) |
| Cash AR Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Income | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 4,950 | 64,350 |
| Other Cash In | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Receipts | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 29,700 | 386,100 |
| CGS Supplies | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 19,500 |
| Payroll - Insiders | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll - Admin | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll - Store | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 208,000 |
| Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Taxes (Itemize) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent Expense - Real Property | - | - | - | - | 33,000 | - | - | - | 33,000 | - | - | - | - | 66,000 |
| Lease Expense - Personal Property | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | - | - | 813 | 813 | 813 | 813 | 813 | 813 | 813 | 813 | 813 | 813 | 813 | 8,938 |
| Real Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telephone and Utilities | - | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 16,500 |
| Repairs and Maintenance | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 4,875 |
| Travel and Entertainment (Itemize) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Misc Expense - Outside Services | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,000 |
| Misc Expense - Office | 700 | 700 | 700 | 700 | 1,200 | 700 | 700 | 700 | 1,200 | 700 | 700 | 700 | 700 | 10,100 |
| Misc Expense - Automobile | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 13,000 |
| Misc Expense - Credit Card Fees | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 375 | 4,875 |
| Misc Expense - Advertising | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,500 |
| Corporate G & A | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Gain on Sale of Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal and Professional | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Outlays | 23,450 | 23,450 | 25,763 | 25,763 | 59,263 | 25,763 | 25,763 | 25,763 | 59,263 | 25,763 | 25,763 | 25,763 | 25,763 | 397,288 |
| Net Change in Cash | 6,250 | 6,250 | 3,938 | 3,938 | (29,563) | 3,938 | 3,938 | 3,938 | (29,563) | 3,938 | 3,938 | 3,938 | 3,938 | (11,188) |
| Plus: Beginning Cash | - | 6,250 | 12,500 | 16,438 | 20,375 | (9,188) | (5,250) | (1,313) | 2,625 | (26,938) | (23,000) | (19,063) | (15,125) | - |
| Ending Cash Balance | 6,250 | 12,500 | 16,438 | 20,375 | (9,188) | (5,250) | (1,313) | 2,625 | (26,938) | (23,000) | (19,063) | (15,125) | (11,188) | (11,188) |

### 13 Week Forecast

**Assumptions**

| | |
|---|---|
| Cash Revenue | See Assumptions Revenue tab |
| Less: Returns / Claims | Historical rate |
| Cash AR Collections | |
| Other Operating Income | 45% of revenue from licensed store in Riverside, CA |
| Other Cash In | |
| **Total Cash Receipts** | |

| | |
|---|---|
| CGS Supplies | Approx 6% of revenues |
| Payroll - Insiders | Actual Run rate |
| Payroll - Admin | Actual Run rate |
| Payroll - Store | Actual Run rate |
| Payroll Taxes | Calculated |
| Other Taxes (Itemize) | Actual Run rate |
| Rent Expense - Real Property | Per Real Estate Schedule |
| Lease Expense - Personal Property | Actual Run rate |
| Insurance | Actual Run rate |
| Real Property Taxes | Actual Run rate |
| Telephone and Utilities | Based on Prior year financials |
| Repairs and Maintenance | Estimated based on prior year |
| Travel and Entertainment (Itemize) | Forecasted based on activities |
| Misc Expense - Outside Services | Based on prior year financials |
| Misc Expense - Office | Estimated based on prior year |
| Misc Expense - Automobile | Forecasted based on activities |
| Misc Expense - Credit Card Fees | Actual Run rate |
| Misc Expense - Advertising | Forecasted based on activities |
| Corporate G & A | Actual Run rate |
| Net Gain on Sale of Assets | |
| Other Non-Operating Income | |
| Interest Expense | |
| Legal and Professional | |
| Other Non-Operating Expense | |
| **Total Outlays** | |

**13 Week Forecast**

|  | USDC Tuchman | USDC Portsmouth | USDC Fresno | Cleaners Club Sub | Enivel | TOTAL |
|---|---|---|---|---|---|---|
| 2010 Revenue Forecast 13 weeks | 1,800,000 | 1,081,900 | 1,305,000 | 325,000 | 1,467,800 | 6,059,700 |
| 2009 Revenue Actual 13 weeks | 1,992,176 | 1,118,704 | 1,404,809 | 490,000 | 1,410,284 | 6,415,973 |
| $ Increase (Decrease) | (112,176) | (36,804) | (99,809) | (165,000) | 57,516 | (356,273) |
| % Increase (Decrease) | -5.63% | -3.29% | -7.10% | -33.67% | 4.08% | -5.55% |
| Prior 60 days run rate vs prior yr | -6.35% | -12.08% | -2.09% | -17.14% | 0.48% | -5.81% |

# EXHIBIT "2"

## Creditors Asserting Claims Against Cash Collateral

| Debtor | Lender | Amount | UCC-1 Date | Description of Collateral * |
|---|---|---|---|---|
| Enivel | Craig Rankin | 65,000 | 11/30/2006 | All assets |
| | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Team Equipment, Inc. | 1,483,912 | 4/14/2009 | All assets |
| | Bell Hop Cleaners | 359,557 | 4/14/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| | First Hawaiian Bank | 436,100 | 11/20/2009 | All assets |
| Cleaners Club | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Abdul R. Chauthani | 81,697 | 12/15/2008 | All assets |
| | Robin Rix | 143,058 | 12/15/2008 | All assets |
| | Caine & Weiner Company, Inc. | 7,500 | 12/15/2008 | |
| | Team Equipment, Inc. | 1,483,912 | 4/14/2009 | All assets |
| | Bell Hop Cleaners | 359,557 | 4/14/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| Steam Press | Craig Rankin | 65,000 | 11/30/2006 | All assets |
| | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Team Equipment, Inc. | 1,483,912 | 4/14/2009 | All assets |
| | Bell Hop Cleaners | 359,557 | 4/14/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| | First Hawaiian Bank | 436,100 | 11/20/2009 | All assets |
| US Dry Cleaning | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Caine & Weiner Company, Inc. | 7,500 | 12/15/2008 | |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| | Jonathan Neil & Assoc, Inc. | 17,603 | 11/12/2009 | |
| | David Golubchick | 106,000 | 1/5/2010 | All assets |
| | Martin Brill | 212,000 | 1/5/2010 | All assets |
| | Lester and Diane Taylor, trustees | 238,500 | 1/5/2010 | All assets |
| | Timoth Rand | 212,000 | 1/5/2010 | All assets |
| | Prestige Cleaners, Inc. | 73,181 | 1/22/2010 | |

* Collateral has not been verified with security agreement or actual UCC-1

| Creditors Asserting Claims Against Cash Collateral | | | | |
|---|---|---|---|---|
| **Debtor** | **Lender** | **Amount** | **UCC-1 Date** | **Description of Collateral \*** |
| USDC Fresno | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Team Equipment, Inc. | 1,483,912 | 4/14/2009 | All assets |
| | Bell Hop Cleaners | 359,557 | 4/14/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| USDC Fresno 2 | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Team Equipment, Inc. | 1,483,912 | 4/14/2009 | All assets |
| | Bell Hop Cleaners | 359,557 | 4/14/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| USDC Tuchman | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Setal 6 | 2,703,450 | 6/3/2009 | All assets |
| | Baker & Daniels | 43,327 | 9/25/2009 | |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| | David Golubchick | 106,000 | 1/5/2010 | All assets |
| | Martin Brill | 212,000 | 1/5/2010 | All assets |
| | Lester and Diane Taylor, trustees | 238,500 | 1/5/2010 | All assets |
| | Timothy Rand | 212,000 | 1/5/2010 | All assets |
| USDC Portsmouth | Setal 3 | 2,619,548 | 7/15/2008 | All assets |
| | Setal 4 | 2,106,949 | 7/15/2008 | All assets |
| | Setal 5 | 1,335,216 | 7/15/2008 | All assets |
| | Setal 1 | 858,213 | 10/30/2008 | All assets |
| | Setal 1 | 1,158,132 | 10/30/2008 | All assets |
| | Setal 2 | 1,266,525 | 10/30/2008 | All assets |
| | Setal 6 | 2,703,450 | 6/3/2009 | All assets |
| | Richardson & Patel | 171,221 | 10/29/2009 | All assets |
| | David Golubchick | 106,000 | 1/5/2010 | All assets |
| | Martin Brill | 212,000 | 1/5/2010 | All assets |
| | Lester and Diane Taylor, trustees | 238,500 | 1/5/2010 | All assets |
| | Timoth Rand | 212,000 | 1/5/2010 | All assets |
| | NewStar | 1,067,750 | | All assets |

\* Collateral has not been verified with security agreement or actual UCC-1

22

# EXHIBIT "3"

## Schedule of Cash Collateral Balances*
As of 3-4-10

| Debtor/Location | CASH COLLATERAL | | |
| --- | --- | --- | --- |
| | Cash | Accounts Receivable | Total |
| USDC Tuchman | 15,042 | - | 15,042 |
| USDC Portsmouth | 321 | 12,483 | 12,804 |
| Cleaners Club Sub | 1,585 | 1,691 | 3,276 |
| Fresno | 68 | - | 68 |
| Fresno 2 | - | - | - |
| Enivel | 37,881 | 441,572 | 479,453 |
| Steam Press Inc. | - | - | - |
| US Dry Cleaning Services Inc. | 27,949 | - | 27,949 |
| | $ 82,846 | $ 455,746 | $ 538,592 |

* Estimated balances

# EXHIBIT "4"

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is dated and effective as of February 15, 2008 (the "Commencement Date"), by and between USDC Fresno, Inc., a California corporation (the "Company") and Tom Jones ("Executive").

WHEREAS, the Company wishes to employ Executive, and Executive wishes to be employed by the Company on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, terms, covenants and conditions set forth herein and the performance of each, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Employment.

(a) The Company hereby employs Executive in the position of District President - Fresno (the "Position"). Executive shall have such responsibilities, duties and authorities consistent with the Position as may be established from time to time by, and shall report directly to, the Board of Directors of the Company. Executive hereby accepts this employment upon the terms and conditions contained herein and agrees to devote his full business time, attention and efforts to promote and further the business of the Company, and Executive shall not, during the term of his employment by the Company, be engaged in any other business activity pursued for gain, profit or other pecuniary advantage without the prior written consent of the Company; provided, however, that the foregoing limitations shall not be construed as prohibiting Executive from (i) serving on the board of directors of charitable institutions or other companies that are not in competition with the Company, provided that such activities in no way interfere with Executive's duties and responsibilities hereunder or otherwise create a conflict of interest with the Company, or (ii) making personal passive investments in such form or manner as will neither require his services in the operation or affairs of the companies or enterprises in which such investments are made, nor violate the terms of this Agreement.

(b) Executive faithfully shall adhere to, execute and fulfill all commercially reasonable policies established by the Company, consistent with the other terms of this Agreement.

2. Compensation. For all services rendered by Executive in any capacity required hereunder, the Company shall compensate Executive as follows;

(a) Base Salary. Executive shall be paid a base salary at the rate of $175,000 per year (the "Base Salary"), payable on a monthly basis in accordance with the Company's standard payroll procedures. The Base Salary will be reviewed annually based upon the Company's and Executive's performance and will be increased in the Company's sole discretion.

(b) Bonus. In addition to the Base Salary, Executive shall receive such bonuses, if any, consistent with the bonuses paid to other District Presidents of the Company, as may be authorized, declared, and paid by board of directors of the Company, acting in its sole discretion.

(c) *Benefits and Other Compensation.*  Executive shall be entitled to receive additional benefits and compensation from the Company as follows:

(i)   Payment of such premiums (or such portion thereof as is provided by the Company's plans) for medical coverage for Executive and his immediate family.

(ii)   Payment of such premiums (or such portion thereof as is provided by the Company's plans) for disability, dental, life and other insurance plans that the Company may have in effect from time to time, on terms no less favorable to Executive than those generally provided to other executives of the Company.

(iii)   Timely reimbursement for all business travel and other out-of-pocket expenses approved by the Company and reasonably incurred by Executive in the performance of his services pursuant to this Agreement, including without limitation, cellular and wireless connections.  All reimbursable expenses shall be appropriately documented in reasonable detail by Executive upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policy and requirements of applicable tax law.

(iv)   The Company shall allow Executive to participate in all other company-wide employee benefits, including the Company's 401(k) plan, as may be made available generally to other executives from time to time.

(v)   Executive shall be entitled to take vacation time off in accordance with the following schedule:

Year 1 – three weeks
Year 2 – four weeks
Year 3 – four weeks

Any unused vacation shall accrue from year to year up to a maximum of four weeks.

(vi)   The Company shall pay Executive $500 per month for a car allowance, plus gas for business usage, maintenance and insurance; provided, that Executive maintains vehicle in good working condition.

- 2 -

(vii)    The Company shall provide Executive with one or more key man life insurance policies during the term of this Agreement. The beneficiary of such policy(ies) shall be the Company.

(d) *No Other Compensation or Benefits; Payment.* The compensation and benefits specified in this Section 2 of this Agreement shall be in lieu of any and all other compensation and benefits. Payment of all compensation and benefits to Executive hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

(e) *Cessation of Employment.* In the event Executive shall cease to be employed by the Company for any reason, then Executive's compensation and benefits shall cease on the date of such event, except as otherwise provided herein or in any applicable employee benefit plan or program.

(f) *Relocation Protection.* Executive's office shall be located in Fresno, California; provided, however, Executive shall be required to travel for business on an as needed basis.

3.  Term; Termination; Rights on Termination. The term of this Agreement shall begin on the Commencement Date and continue until February 14, 2011 (the "Initial Term"), unless sooner terminated in accordance with the provisions hereof. The Initial Term shall automatically be extended for successive annual periods (collectively with the Initial Term, the "Term"), if and only if, (i) Executive provides the Company with written notice of the expiration of the then current Term not earlier than 180 days and not later than 120 days prior to the expiration of the then current Term and (ii) the Company does not notify Executive in writing of its intention to terminate this Agreement not later than 90 days prior to the expiration of the then current Term. This Agreement and Executive's employment may be terminated in any one of the following ways:

(a) *Death.* The death of Executive shall immediately terminate this Agreement, provided, however, that the Company shall continue for a period of six months from the date of such termination to (i) pay to the Executive's estate the amounts normally payable to him in accordance with his then current Base Salary and (ii) provide the benefits set forth in Section 2(d)(i) to Executive's immediate family or reimburse Executive's immediate family for such amounts if the Company is not permitted under its benefit plans to continue to provide Executive's immediate family with such benefits upon Executive's death.

(b) *Disability.* If, as a result of Executive's incapacity due to physical or mental illness, Executive shall not have performed his material duties hereunder on a full-time basis for ninety (90) days or more in any period of one hundred eighty (180) consecutive days ("Disability"), Executive's employment under this Agreement may be terminated by the Company upon thirty (30) days written notice if Executive is unable to resume performing his material duties at the conclusion of such notice period. Executive's compensation during any period of Disability prior to the effective date of such termination shall be the amounts normally payable to him in accordance with his then current annual base salary, reduced by the amounts of

OC 286132929v4

disability, if any, paid to Executive under any Company disability program. Executive shall not be entitled to any further compensation from the Company for any period subsequent to the effective date of such termination, except as provided in Section 3(f) below and for other pay or benefits, if any, in accordance with then existing severance policies of the Company and the severance terms of Company benefit plans.

(c) Termination by the Company.

(i) _For Cause_. The Company may terminate this Agreement immediately upon written notice to Executive for "Cause", which shall be defined as Executive's: (1) conviction of or plea of _nolo contendere_ to a felony; (2) misconduct that is materially detrimental to the operations of the Company which is not cured within ten (10) days of written notice to Executive or which constitutes a second instance of misconduct that is materially detrimental to the operations of the Company; (3) material breach of this Agreement which is not cured within ten (10) days of written notice to Executive or which constitutes a second instance of any material breach, (4) material breach of any material published corporate policy of the Company that is generally applicable to employees of the Company which is not cured within ten (10) days of written notice to Executive or which constitutes a second instance of any material breach, or (5) gross negligence in performing duties, serious inattention to ordinary job responsibilities, habitual failure to use reasonable efforts to perform material duties, or repeated failure to follow lawful directives of the Company (unless due to death or Disability). In the event of a termination for Cause, Executive shall have no right to any severance compensation. If Executive resigns or otherwise terminates his employment for any reason other than pursuant to Section 3(d) below, Executive shall receive no severance compensation.

(ii) _Without Cause_. In addition to the provisions of Section 4(c)(i), the Company may, at any time, terminate this Agreement upon sixty (60) days' written notice to Executive. In the event of such a termination, Executive shall have the right to receive severance compensation as set forth below in Section 3(f).

(d) _Termination by Executive_. Executive may terminate this Agreement upon sixty (60) days' written notice to the Company if the Company is in material breach of this Agreement, which breach remains uncured after thirty (30) days written notice thereof to the Company. In the event of such a termination, Executive shall have the right to receive severance compensation set forth in Section 3(f).

OC 286132929v4

(e) *Payment Through Termination.* Upon termination of this Agreement for any reason provided above, Executive shall be entitled to receive all compensation earned and all benefits and reimbursements due, through the effective date of termination (including payments for accrued vacation and sick leave). Additional compensation subsequent to termination, if any, shall be due and payable to Executive only to the extent and in the manner expressly provided above. All other rights and obligations under this Agreement shall cease as of the effective date of termination, except that Executive's obligations under <u>Sections 3</u>, <u>5</u>, <u>6</u>, <u>7</u> and <u>9</u> shall survive such termination in accordance with their terms.

(f) *Severance.* If, at any time prior to the end of the Initial Term, Executive's employment is terminated by the Company without Cause, due to Executive's death or Disability, or by Executive pursuant to <u>Section 3(d) above</u>, the Company shall, subject to the execution by Executive or his executor or personal representative of a general release (the "Release") of all claims and rights that Executive may have against the Company and the Company's related entities and their respective shareholders, officers, directors, managers and employees relating to Executive's employment and/or termination (other than claims and rights for payments, compensation or benefits provided for under this subsection (f), in a form reasonably acceptable to the Company and Executive's compliance with the surviving obligations contained in <u>Sections 3</u> and <u>6</u> (the "Continuing Obligations"), pay Executive all accrued but unpaid Base Salary and Bonus as of the effective date of termination, together with the Base Salary that would be payable under <u>Section 2</u> through the end of the Initial Term following the termination date, payable in accordance with the Company's standard payroll procedures (the "Severance Period"). If, following the Initial Term, Executive's employment is terminated by the Company without Cause, or by Executive pursuant to <u>Section 3(d) above</u>, the Company shall, subject to the execution by Executive of the "Release" and Executive's compliance with the Continuing Obligations, pay Executive all accrued but unpaid Base Salary plus any accrued bonus as of the effective date of termination, together with the Base Salary that would be payable under <u>Section 2</u> for a period of two (2) months following the termination date, payable in accordance with the Company's standard payroll procedures.

For purposes of <u>Sections 3</u>, <u>4</u>, <u>5</u>, <u>6</u>, <u>7</u> and <u>8</u>, the term "Company" shall be deemed to include all affiliates of the Company.

4. <u>Inventions</u>. Executive hereby agrees promptly to disclose to the Company and Executive hereby, without further compensation, assigns and agrees to assign to the Company or its designee, Executive's entire right, title, and interest in and to all designs, trademarks, logos, business plans, business models, business names, economic projections, product innovations, discoveries, formulae, processes, computer software programs, source codes, methods, techniques, trade secrets, data, materials, models, systems, customer lists, supplier lists, inventions, research, improvements, ideas, plans, or patents, service marks, copyrightable works, know-how and other materials and information which derive economic value by not being generally available to the public (collectively, "Inventions"), including all rights to obtain, register, perfect, and enforce the Inventions which relate to Executive's work during the period of Executive's employment with the Company, whether or not during normal working hours, or which are aided by the use of the Company experience, time, material, equipment, supplies, facilities, or trade secrets, it being understood that no rights are hereby conveyed in Inventions, if any, made by Executive prior to Executive's employment with the Company. Executive agrees

- 5 -

to perform, during and after Executive's employment, all acts deemed necessary or desirable by the Company to permit and assist it, at its expense, including execution of documents and assistance or cooperation in legal proceedings, in obtaining and enforcing the full benefits, enjoyments, rights, and title throughout the world in the Inventions assigned to the Company above. Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents, as Executive's agents and attorneys-in-fact to act for and on behalf and instead of Executive, to execute and file any applications or related filings or any other documentation related thereto and to do all other lawfully permitted acts deemed necessary or desirable by the Company to protect such Inventions by patents, copyrights or otherwise in any and all countries and to vest title to such Inventions in the Company, its successors and assigns, with the same force and legal effect as if executed by Executive.

5. Confidential Information and Trade Secrets. Executive acknowledges that the Company has developed or acquired and uses commercially valuable information including, without limitation, designs, business plans, business models, business names, economic projections, product innovations, discoveries, formulae, processes, computer software programs, source codes, methods, techniques, trade secrets, data, materials, models, systems, customer lists, supplier lists, inventions, research, improvements, ideas, plans, customer lists, prospect lists, employee and agent identities, manuals, business plans, financial reports and projections, computer software programs, source codes, methods, techniques, ideas, plans, know-how and other materials and information which derive economic value by not being generally available to the public (the "Confidential Information") and the Company regards the Confidential Information as valuable trade secrets of the Company, the use and disclosure of which must be carefully and continuously controlled. Executive further acknowledges that Executive may have access from time to time to such Confidential Information. Executive agrees not to disclose, disseminate, divulge or publish any Confidential Information to anyone other than in the course of the performance of Executive's duties with the Company and then solely for the benefit and at the discretion of the Company. All records and other materials pertaining to the Confidential Information shall be and remain the property of the Company and shall be returned to the Company promptly upon its request.

Executive recognizes that the disclosure and/or use of Confidential Information by Executive will cause the Company to suffer irreparable injury which may not be adequately compensated by damages. Accordingly, in the event of a breach or threatened breach of the provisions of this paragraph, the Company shall be entitled to an injunction restraining Executive from disclosing, in whole or in part, the Confidential Information defined above or from rendering any services to any person, firm, corporation, association or other entity to whom such Confidential Information, in whole or in part, has been disclosed or is threatened to be disclosed. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach, including the recovery of damages from Executive. These obligations shall survive the termination of Executive's employment.

Prior to Executive submitting or disclosing for possible publication or dissemination outside of the Company any material prepared by Executive that incorporates information that concerns the Company's business or anticipated research, Executive agrees to deliver a copy of such material to an officer of the Company for review. The Company agrees to notify Executive

OC 286132929v4

within a reasonable period of time whether it believes such material contains Confidential Information, and Executive agrees to make such deletions and revisions as are requested by the Company to protect its Confidential Information. Executive further agrees to obtain the written consent of an officer of the Company prior to making such material available for review by persons outside of the Company.

6. <u>Return of Company Property; Termination of Employment</u>. At such time, if ever, as Executive's employment with the Company is terminated, he shall be required to participate in an exit interview for the purpose of assuring a proper termination of his employment and his obligations hereunder. On or before the actual date of such termination, Executive shall return to the Company all records, materials and other physical objects relating to his employment with the Company, including, without limitation, all Company credit cards and access keys and all materials relating to, containing or derived from any Trade Secrets or Confidential Information.

7. <u>No Prior Agreements</u>. Executive hereby represents and warrants to the Company that the execution of this Agreement by Executive and his employment by the Company and the performance of his duties hereunder will not violate or be a breach of any agreement with a former employer, client or any other person or entity. Further, Executive agrees to indemnify the Company for, and hold the Company harmless from, and against, all claims, including, but not limited to, attorneys' fees and expenses of investigation, by any such third party that such third party may now have or may hereafter come to have against the Company based upon or arising out of any noncompetition agreement, invention or secrecy agreement between Executive and such third party which was in existence as of the date of this Agreement.

8. <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, legal representatives, successors and assigns. Executive understands that he has been selected for employment by the Company on the basis of his personal qualifications, experience and skills. Executive agrees, therefore, that he cannot assign all or any portion of his performance under this Agreement.

9. <u>Entire Agreement</u>. This Agreement is not a promise of future employment. This Agreement and the exhibit annexed hereto constitute the entire understanding between the parties with respect to the subject matter hereof, and supersede all other understandings and negotiations with respect thereto.

10. <u>Notice</u>. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when confirmation of receipt is received, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

To the Company:

USDC Fresno, Inc.
4040 MacArthur Boulevard, Suite #305
Newport Beach, CA 92660
Attention: Robbert Y. Lee
Fax No: (949) 863-9657

with a copy to:

Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Attn: Spencer Feldman, Esq.
Fax No.: (212) 805-9221

To Executive:

Tom Jones
529 East Shields Avenue
Fresno, CA 93704
Fax No.: (559) 224-4615

with a copy to:

Fishman, Larsen, Goldring & Zeitler
7112 North Fresno Street, Suite 450
Fresno, California 93720
Attn: Peter N. Zeitler, Esq.
Fax No.: (559)256-5005

Either party may, by notice given in accordance with this Section, specify a new address for notices under this Agreement.

11. Severability: Headings. It is the intention of the parties that the provisions herein shall be enforceable to the fullest extent permitted under applicable law, and that the unenforceability of any provision or provisions hereof, or any portion thereof, shall not render unenforceable or otherwise impair any other provisions or portions thereof. If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, void or invalid in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provisions or portions thereof and to alter the bounds thereof, including specifically, any time, place and manner restrictions contained in any of the restrictive covenants contained herein, in order to render it valid and enforceable. In any event, the balance of this Agreement shall be enforced to the fullest extent possible without regard to such unenforceable, void or invalid provisions or part thereof. The Section headings herein are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent or intent of this Agreement or of any part hereof.

12. No Third-Party Beneficiaries. Except as otherwise provided in this Agreement, this Agreement is for the sole benefit of the parties hereto, and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto, any legal or equitable rights hereunder.

13. Jurisdiction. Each of the parties hereto hereby irrevocably agrees that any action or proceeding against it seeking any remedy arising out of this Agreement or any of the transactions contemplated hereby shall be brought only in the courts of the State of California, County of Orange, or the United States District Court for the Central District of California, and each party consents to service of process outside the territorial jurisdiction of any such court (which service may be made by mailing a copy of such process by certified or registered mail, postage prepaid, to the party to be served at its address as provided in Section 10 hereof, with such service to be effective upon receipt) and will not assert the defense of lack of personal jurisdiction or *forum non conveniens* in response to any such action or seek to change venue from the forum in which any such action is initially commenced.

14. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California; provided, however, if any California law or laws shall require or permit the application of the laws of any other jurisdiction to the Agreement, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless be applied.

15. Counterparts. This Agreement may be executed in any number of counterparts (which may be delivered by facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

16. Modifications. This Agreement may not be amended or waived except by a writing signed by Executive and by a duly authorized representative of the Company other than Executive. No waiver by Executive or the Company of any breach of any provision hereof will be deemed a waiver of any prior or subsequent breach of the same or any other provision. The failure of Executive or the Company to exercise any right provided herein will not be deemed on any subsequent occasions to be a waiver of any right granted hereunder to either of them

EXECUTIVE ACKNOWLEDGES THAT, BEFORE SIGNING THIS AGREEMENT, HE WAS GIVEN AN OPPORTUNITY TO READ IT, CAREFULLY EVALUATE IT, AND ASK ANY QUESTIONS HE MAY HAVE HAD REGARDING IT OR ITS PROVISIONS. EXECUTIVE ALSO ACKNOWLEDGES THAT HE HAD THE RIGHT TO HAVE THIS AGREEMENT REVIEWED BY AN ATTORNEY OF HIS CHOOSING AND THAT THE COMPANY GAVE HIM A REASONABLE PERIOD OF TIME TO DO SO IF HE SO WISHED. EXECUTIVE FURTHER ACKNOWLEDGES THAT HE IS NOT BOUND BY ANY AGREEMENT WHICH WOULD PREVENT HIM FROM PERFORMING HIS DUTIES AS SET FORTH HEREIN, NOR DOES HE KNOW OF ANY OTHER REASON WHY HE WOULD NOT BE ABLE TO PERFORM HIS DUTIES AS SET FORTH HEREIN.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

USDC FRESNO, INC.

By: _____

Name: _____

Title: _____

_____
Tom Jones

- 10 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

USDC FRESNO, INC.

By: _____

Name: _Robert Y. Lee_____

Title: _President_____


_____

Tom Jones

- 10 -

OC 286132929v4

# EXHIBIT "5"

## MASTER AGREEMENT

THIS MASTER AGREEMENT (the "Agreement") is made and entered into as of the 7 day of December 2009, by and among U.S. DRY CLEANING CORPORATION, a Delaware corporation ("Parent"), USDC FRESNO, INC., a California corporation ("Fresno 1") and USDC FRESNO 2, INC., a California corporation ("Fresno 2") all of whose principal place of business is located at 4040 MacArthur Blvd., Ste 305, Newport Beach, California, 92660; and GAMET ENTERPRISES, LLC, a New Mexico limited liability company ("Manager"), BELLHOP CLEANERS OF CALIFORNIA, a New Mexico corporation ("Bell Hop") and TEAM EQUIPMENT, INC., a California corporation ("Team") all of whose principal place of business located at 529 E. Shields, Fresno, California, 93704.

### RECITALS

WHEREAS, Parent is indebted to Team pursuant to the 10% Senior Secured Convertible Note, dated February 14, 2008, in the initial principal amount of $1,328,876.00 (the "Team Note") and is indebted to Bell Hop pursuant to the 10% Senior Secured Convertible Note, dated February 14, 2008, in the initial principal amount of $306,664.00 (the "Bell Hop Note");

WHEREAS, Fresno 1, Fresno 2, Steam Press Holdings, Inc., Cleaners Club Acquisition, Inc., USDCC CVR Merger Sub, Inc, Robert Y. Lee and Riaz Chauthani have all guaranteed the Team Note and the Bell Hop Note;

WHEREAS, among other collateral all the assets of Fresno 1 and Fresno 2 are pledged to secure the Team Note and the Bell Hop Note;

WHEREAS, the Team Note and the Bell Hop Note (the "Notes") are presently in default;

WHEREAS, Setal 1, LLC, Setal 2, LLC, Setal 3, LLC, Setal 4, LLC, Setal 5, LLC, and Setal 6, LLC (collectively, "Setal") is also the holder of a security interest in the assets which secure the Notes;

WHEREAS, a potential dispute exists between Bell Hop and Team, and Setal, with regard to the priority of their security interests and with regard to the collateral actually pledged to secure the Notes; and

WHEREAS, the parties to this Agreement wish to resolve the defaults under the Team Note and the Bell Hop Note and to extend the terms thereof upon the terms and conditions set forth herein;

1

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, and based upon the foregoing Recitals, the parties agree as follows:

1.  <u>Incorporation of Recitals.</u> Each of the above recitals is incorporated herein and deemed to be the agreement of the parties hereto and is relied upon by each party to this Agreement in agreeing to the terms of this Agreement.

2.  <u>Extension of Notes.</u> Subject to the terms and conditions hereto and effective upon satisfaction of the conditions precedent set forth in Section 4 hereof, Bell Hop and Team waive the defaults under the Notes and agree to extend the term of the Notes to June 30, 2010. Payments under the Notes shall be made from the escrow distributions described in Section 4.3 hereof and from the disbursements, if any, made by Manager pursuant to Section 2.2 of the Management and Operating Agreement (the "Management Agreement"), dated of even date herewith, by and among Parent, Fresno 1, Fresno 2 and Manager attached hereto as Exhibit A and made a part hereof.

3.  <u>Confirmation of Collateral and Notes.</u> Parent, Fresno 1 and Fresno 2 (the "Borrower Parties") hereby grant and affirm that the Notes and the guarantees of the Notes are valid and binding obligations of Borrower Parties enforceable in accordance with their terms, and hereby grant and confirm that all obligations of Borrower Parties to Bell Hop and Team are secured by a perfected security interest in all of the assets of Fresno 1 and Fresno 2. Borrower Parties hereby agree that in addition to acting as Manager (as defined in the Management Agreement), that Manager shall hold the assets and leases which are delivered to Manager pursuant to the Management Agreement for Team and Bell Hop as their agent for purposes of supplemental perfection of the security interest of Team and Bell Hop in such assets. Without limitation Borrower Parties confirm and grant that Team and Bell Hop have or will have a perfected possessory security interest in the assets located at each of the Premises and in the contractual leasehold rights of and to the Premises for the purpose of securing the Notes. Borrower Parties consent to Manager acting in such dual role and waive any conflict arising as a result of Manager acting in such dual role, provided that nothing contained in this Section 3 shall constitute consent to Manager acting in breach of the express provisions of the Management Agreement so long as the Management Agreement is in force and effect and Borrower Parties are in compliance therewith.

Except as set forth in Sections 2, 3 and 5.4 hereof, this Agreement is not intended to in any way modify or amend the Notes or the related loan documents.

4.  <u>Conditions Precedent.</u> Borrower Parties understand that this Agreement shall not be effective and Bell Hop and Team shall have no obligation to amend the Notes or to waive the defaults unless and until the following conditions precedent has been satisfied not later

2

36

than the date set forth herein, or waived by Team and Bell Hop for whose sole benefit such conditions exist.

4.1    Concurrently with the execution hereof, Borrower Parties shall have executed and delivered the Management Agreement, and shall have returned the current portion of the funds described on Exhibit B to the Operational Accounts (as defined in the Management Agreement").

4.2    Parent shall cause the 650,000 shares of stock to be released by JP Morgan promptly after execution hereof.  Parent shall further cause all restrictions or legend on all shares or certificates issued to any owner or affiliate of Manager to be removed or released to the maximum extent permitted by law.

5.    Covenants.

5.1    Promptly after entering into an escrow or escrows with respect to the sale of the assets of [USDC Indianapolis] (or any other escrows for the sale of any assets of Parent of any of its subsidiaries) , Parent and the other parties thereto shall execute and deliver to the escrow agent, Bell Hop and Team irrecoverable escrow instructions which shall provide for payment of the following amounts directly from such escrows (i) reimbursement of any remaining unreimbursed amount as described on Exhibit B, (ii) any accrued unpaid interest on the Notes as of the date of the closing of such escrows, and (iii) to Setal the greater of $3,000,000.00 or 75% of the net proceeds from such escrows.

5.2    USDC shall remit to Manager 10% of the amount of any capital raise or equity offering received in December of 2009 and 20% of the amount of any capital raise or equity offering received in January of 2010 until the amounts described in Section 5.1 (i) and (ii) have been paid in full,

5.3    If the escrows or capital raise described in Section 5.1 and 5.2 have not closed on or before February 25, 2010, then Borrower Parties shall pay from other sources any unpaid amounts on Exhibit B and any accrued unpaid interest on the Notes through February 25, 2010.

5.4    To the extent not paid from excess proceeds pursuant to the Management Agreement the Borrower parties shall maintain all interest current on the Notes on a monthly basis from and after February 25, 2010.

5.5    Borrower Parties covenant and agree not to change the persons designated as an authorized signatory to write checks or draw funds on the Operational Accounts as set forth in Section 1.4 of the Management Agreement without the express written consent of Team and Bell Hop.

5.6.    In the event that the Management Agreement remains in effect as of the date of expiration of Tom Jones' employment agreement, then the employment agreement shall continue to remain in effect until the Management Agreement expires or is

3

terminated.

    5.7    Borrower Parties shall return the funds described on Exhibit B to the Operational Accounts (as defined in the Management Agreement").

    5.8    Borrower Parties shall provided to Team and Bell Hop on or before December 15, 2009 the information described on Exhibit C attached hereto and made a part hereof, and shall thereafter provide to Team and Bell Hop all financial information provided to Setal from time to time.

    5.9    USDC shall negotiate arrangements with United to secure this week's delivery of supplies to Fresno 1 and Fresno 2.

    6.    Breach and Remedies.  In the event that Borrower Parties breach any of the covenants contained in this Agreement, fail to satisfy any of the conditions precedent set forth herein on or before the date set forth therein, the term of the Notes (as extended hereby) expires, the Borrower Parties are in default of any of the provisions of any of the exhibits hereto and any applicable cure periods have passed or if any of Setal shall declare an event of default under any obligations owing from any Borrower Party to any of Setal, then Bell Hop and Team shall be entitled to exercise in respect of any collateral they may hold all rights and remedies of a secured creditor available under applicable laws, and shall also be entitled to exercise all rights and remedies available to as a creditor generally, including without limitation all remedies available under the Notes or any loan documents in connection therewith, as well as rights and remedies available at law or in equity. All rights and remedies shall be cumulative. No failure or delay in exercising any power, right or remedy shall operate as a waiver thereof, and no single or partial exercise of any such power, right or remedy shall preclude any further exercise thereof or the exercise of any other party, right or remedy.

    7.    Miscellaneous.

    7.1    Attorneys' Fees.  In the event of a claim by either party arising under or in connection with this Agreement or any Schedule, Exhibit, certificate, or other instrument furnished under and referring to this Agreement, then the prevailing party shall be entitled to be reimbursed for all costs, fees, and expenses incurred in connection with prosecuting or defending such claim, including reasonable attorneys' fees.

    7.2    Other Agreements Superseded; Waiver and Modification, Etc.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties, except for written agreements executed contemporaneously herewith which expressly refer to this Agreement. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties. No waiver of any condition or provision shall be enforceable unless made in writing. Nothing in this Agreement shall be construed to give any person or entity other than the parties hereto any rights or remedies.

4

7.3  Further Assurances.  Each party agrees to execute such instruments or documents or take such further action as the other may reasonably request to carry out the intent of this Agreement.

7.4  Notices.  Any notice relating to this Agreement shall be deemed sufficiently given and served for all purposes if and when given if personally served or sent by facsimile to the fax number set forth below, on the first business day after sent if sent by federal express or other overnight delivery service addressed to the address set forth for such party above, or five business days after sent if deposited in the United States mail, postage or other charges prepaid and registered.

> If to Borrower
> Parties:            (949) 612-2728
>
> If to Manager
> Team or Bell Hop:   (559) 224-4615

Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

7.5  Law Governing.  This Agreement shall be construed and interpreted in accordance with and governed and enforced in all respects by the laws of the State of California, except that this Agreement shall be given a fair and reasonable construction in accordance with the intention of the parties and without regard to, or aid of, Section 1654 of the California Civil Code.

7.6  Headings.  The article and section headings throughout the Agreement are provided for convenience only and the words contained therein shall in no way be held to expand, amplify, modify, or aid in the interpretation or construction thereof.

7.7  Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, and successors of the parties hereto, but no right or liability or obligation arising hereunder may be assigned by any party hereto without the express written consent of the other parties.

7.8  Counterparts.  This Agreement may be executed in any number of counterparts and each such executed counterpart shall be deemed to be an original instrument, but all such executed counterparts together shall constitute one and the same instrument, and such instrument shall be deemed to have been made, executed, and delivered on the date first hereinabove written, irrespective of the time or times when the same or any counterparts thereof may have actually been executed and delivered.

7.9  Independent Contractor.  The parties acknowledge and agree that neither this Agreement nor any of the Exhibits hereto Agreement and the other Loan Documents shall be deemed or construed to create a partnership, tenancy in common, joint

5

39

tenancy, joint venture, co-ownership or any other relationship aside from a continuing debtor-creditor relationship and the relationship arising under the Management Agreement pursuant to which Manager is an independent contractor providing management services to Owner (as defined therein).

7.10  Severability.  In the event any of the provisions of this Agreement shall be declared by a court to be void or unenforceable, then such provision shall be severed from this Agreement without affecting the validity and enforceability of any of the other provisions hereof, and the parties shall negotiate in good faith to replace such unenforceable or void provisions with a similar clause to achieve, to the extent permitted under law, the purpose and intent of the provisions declared void and unenforceable.

7.11  Force Majeure.  Neither party shall be liable for any failure to perform due to acts of God or government or any state or political subdivision thereof, war, fires, floods, explosions or other catastrophes, civil disturbance, strikes, riots, unusual severe weather, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment, or other event beyond such party's reasonable control ("Force Majeure").  In such event, the performance of such party's obligations shall be suspended during, but not longer than, the period of existence of such cause and the period reasonably required to perform the obligation.  The parties will use their best efforts to minimize the consequences of Force Majeure.

7.12  Noncontinuing Waiver.  A waiver by any party of an existing or future default of any provision of this Agreement shall not be construed as a continuing waiver or a waiver of any future default and any subsequent default of any term hereof may be enforced as if no waiver had ever been made or granted.

6

IN CONSIDERATION OF THE FOREGOING, the parties have executed this Agreement as of the date first set forth above.

**USDC FRESNO INC.**

By: _____

**USDC FRESNO 2 INC.**

By: _____

**U.S. DRY CLEANING CORPORATION**

By: _____

**GAMET ENTERPRISES, LLC**

By: _____

**BELLHOP CLEANERS OF CALIFORNIA, INC.**

By: _____

**TEAM EQUIPMENT, INC.**

By: _____

The undersigned guarantors of the Team Note and the Bell Hop Note consent to the foregoing.

Steam Press Holdings, Inc.

By: _____

Cleaners Club Acquisition, Inc.

By: _____

USDCC CVR Merger Sub, Inc

By: _____

_____
Rick Chauthani

_____
Robert Y. Lee

7

EXHIBIT A

Management Agreement

8

EXHIBIT B

Reimbursement to Operational Accounts

1. Balance to be reimbursed: $$164,944.18

2. Tuesday December 8, 2009 and each Tuesday through December 29, 2009 the sum of $5,000.00,

3. Tuesday January 5, 2010 and each Tuesday thereafter until fully reimbursed the sum of $10,000.00

4. Notwithstanding item 3 above any remaining balance shall be paid earlier on the date of closing of a capital raise or the escrow closing as described in Sections 5.1 or 5.2, and in any event shall be paid in full on or before February 25, 2010

9

**43**

EXHIBIT C

Information

1. September 30, 2009 financials for USDC

23. A copy of the current draft of the offering circular for the franchise.

3. The proposed purchasers and purchase price of the stores (listed by stores) for each of the Indianapolis stores, provided that the identity of purchasers who are not insiders of USDC need to not be disclosed. Insiders are material shareholders of, lenders to or investors in USDC or members of their immediate family.

4. The current intended use of the proceeds from the sale of the Indianapolis stores.

5. An update on the status of the sale of the Indianapolis stores with projected closing dates.

10

44

# EXHIBIT "6"

## MANAGEMENT AND OPERATING AGREEMENT

THIS MANAGEMENT AND OPERATING AGREEMENT (the "Agreement") is made and entered into as of the 7 day of December 2009, by and among U.S. DRY CLEANING CORPORATION, a Delaware corporation ("Parent"), USDC FRESNO, INC., a California corporation ("Fresno 1") and USDC FRESNO 2, INC., a California corporation ("Fresno 2") all of whose principal place of business is located at 4040 MacArthur Blvd., Ste 305, Newport Beach, California, 92660; and GAMET ENTERPRISES, LLC, a New Mexico limited liability company, with its principal place of business located at 529 E. Shields, Fresno, California, 93704 ("Manager").

### RECITALS

A.  Parent is the sole shareholder of Fresno 1 and Fresno 2 (Fresno 1 and Fresno 2 are referred to herein collectively as "Owner");

B.  Owner currently operates seventeen dry cleaning storefronts in California and Arizona as listed on Exhibit "A" (collectively the "Business"). The locations listed on Exhibit A are collectively referred to herein as the "Premises";

C.  Owner and Manager agree that the Manager will manage and operate the Business for and on behalf of Owner for a period ending not later than June 30, 2010.

D.  Owner and Manager each desire to document the terms and conditions of Manager's engagement, as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, and based upon the foregoing Recitals, the parties agree as follows:

### ARTICLE ONE
### MANAGEMENT SERVICES

1.1  Agreement to Engage. Owner hereby confirms the retention of Manager to oversee and manage all aspects of the daily operation of the Business, and Manager hereby confirms acceptance of his retention, by Owner.

1.2  Services to be Rendered. Manager shall be responsible for the day to day administration, operation and management of the seventeen storefronts constituting the Business and maintenance and operation of the Premises. Without limitation, Manager shall be responsible for (i) conducting the day-to-day operations of the Business, (ii) collection of business revenues and providing to Owner regular accountings of collections and payments, (iii) preparation and filing of licenses and permits required for the operation

1

45

of each of the individual Premises and the state and federal employment tax returns (the "Employment Returns") for those employees of Owner working at the Business (the "Employees"), but not corporate tax returns or other returns, (iv) payment on behalf of Owner of the operational expenses of the Business, including, without limitation, salaries of Employees, taxes associated with the Employment Returns and the fees for the licenses and permits described in the preceding subsection, supplies, rent, utilities and other expenses and costs of the Premises, (v) replacement of equipment in the ordinary course of business (provided that any expenditure for the replacement or repair of equipment in excess of $5000 shall only be done with Owner's consent —which consent shall be deemed given if no objection is received within five business days of Owner receiving a written request from the Manager requesting consent to the proposed equipment replacement or repair), (vi) hiring, employing, supervising, directing the work of, promoting, discharging and determining the compensation of all personnel employed at the Business, all of whom shall continue to be employees of Owner, and (vii) taking all reasonable steps to ensure that the Business is operated in compliance with all applicable laws, rules and regulations.

1.3. <u>Prohibited Activities.</u> Without the consent of Owner Manager may not (i) open new facilities or move any facility, (ii) make any capital expenditure or long term lease with a cost in excess of $5000.00, (iii) enter any contact which is not in the ordinary course of business, (iv) enter into any contract which is not terminable upon 90 days of less notice, (v) sell or dispose of any assets of Owner other than in the ordinary course of replacement, (v) make any material change in the manner in which the Business is operated, or (vi) increasing the compensation of any executive personnel employed at the Business without the Owner's consent.

1.4 <u>Regular Accountings.</u> Manager shall provide Owner with regular accountings of cash collections and cash disbursements. The accountings shall be provided to Owner within five (5) days after the end of each month and at any other time a current accounting is requested by the Owner in writing. The accountings shall contain, at a minimum, a listing of cash receipts and cash expenditures for the period and a current balance sheet.

1.5. <u>Financial Operations.</u> Manager shall collect all of the revenues of the Business using Owner's currently existing bank accounts (the "Operational Accounts"), and to the extent funds are available in the Operational Accounts shall promptly pay all operational expenses of the Business when due from the Operational Accounts. Manager shall promptly reimburse Owner or Parent from the Operational Accounts on demand after payment thereof by Owner or Parent for the Business' pro rata share of the cost of workers compensation insurance, employee benefit or health insurance, automobile insurance for vehicles used directly in connection with the Business or premises liability insurance maintained by Owner or Parent and which covers either the Employees or the Premises. Notwithstanding the foregoing if the Business requires any out of the ordinary or extraordinary expense (such as major equipment purchases, premises improvements to satisfy legal requirements etc.) in excess of $10,000.00 then such amounts shall not be paid from the Operational Accounts but shall be paid by Owner from other sources. To the extent that Excess Funds (as defined below) are available in the Operational Accounts over

2

and above those reasonably required for the foregoing operational purposes, Manager shall pay such Excess Funds pro rata to pay any outstanding accrued interest on the 10% Senior Secured Convertible Note, dated February 14, 2008, in the initial principal amount of $1,328,876.00 from Parent to Team Equipment, Inc. (the "Team Note"), and the 10% Senior Secured Convertible Note, dated February 14, 2008, in the initial principal amount of $306,664.00 from Parent to Bell Hop Cleaners of California, Inc. (the "Bell Hop Note"). The Team Note and the Bell Hop Note are referred to collectively as the "Notes". Any further Excess Funds after payment of any accrued outstanding interest on the Notes shall be disbursed 50% to any of Setal 1, LLC, Setal 2, LLC, Setal 3, LLC, Setal 4, LLC, Setal 5, LLC and Setal 6, LLC (collectively, "Setal") and 50% to Bell Hop and Team (pro rata based on the outstanding principal balance of the Notes) as partial payment of amounts due under the Owner's notes outstanding with Setal and under the Team Notes. Manager and Owner agree that direct management and control of cash flow by Manager is critical to the proper operation of the Business and agree that during the term of this Agreement that the only persons designated as an authorized signatory to write checks or draw funds on the Operational Accounts shall be Tom Jones or such other persons who shall subsequently be mutually agreed by Owner and Manager. Owner and Parent shall retain full access to the Operational Accounts for informational purposes but shall not be authorized to write checks on the Operational Accounts or otherwise withdraw, transfer or direct the funds in such Accounts therefrom.

a.   For purposes of this Agreement, the term "Excess Cash" shall refer to any amount of cash in the Operational Accounts in excess of $10,000 at the close of any calendar month.

1.6   General Obligations of Manager.  Manager is authorized and empowered by, for and on behalf of Owner to do any and all acts necessary to effectively perform the obligations of general management, unless otherwise specifically excluded by this Agreement.

1.7   Delivery of the Business to Manager.   Owner has previously delivered possession of the Premises and the physical assets of the Business to the Manager as of the date of this Agreement. Owner authorized Manager to use the office facility located at 529 E. Shields Avenue in Fresno, California for purposes of managing the Business.

## ARTICLE TWO
### TERMS OF ENGAGEMENT

2.1   Effective Date.  This Agreement shall be effective and the term of this Agreement shall commence on the date of execution hereof (the "Effective Date") and shall continue until June 30, 2010, unless sooner terminated as provided in this Agreement.

2.2   Payments on Notes.  Owner hereby irrevocably instructs Manager to pay any Excess Cash, if any, from the operation, as a repayment of the Notes and the Owner's obligations to Setal. Payments shall be applied to accrued but unpaid interest first, secondly principal.

3

2.3  Termination of Agreement.  This Agreement shall be automatically terminated upon the earlier of (a) June 30, 2010, or (b) upon the full satisfaction of the Notes.  This Agreement may also be terminated immediately by either party upon the breach, by the other party, of any of the breaching party's material obligations under this Agreement, where such breach has not been cured within 30 days after the breaching party has received written notice thereof.  Owner may further terminate this Agreement if all or a substantial portion of the assets of Manager are transferred to an assignee for the benefit of creditors, to a receiver or a trustee in bankruptcy.  Manager may terminate this Agreement at any time upon sixty days notice to Owner.

## ARTICLE THREE
## INDEMNITY

3.1.  Indemnity.  Owner will indemnify, defend and hold Manager free and harmless from all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including interest, penalties, attorneys' fees and costs arising from or in connection with this Agreement or Manager's services provided in connection herewith.  This obligation to indemnify and defend shall not apply to the extent that the claim, demand, loss, cost, expense, obligation, liability, damage or recovery is caused by the gross negligence or intentional misconduct of Manager.

## ARTICLE FOUR
## GENERAL PROVISIONS

4.1  Attorneys' Fees.  In the event of a claim by either party arising under or in connection with this Agreement or any Schedule, Exhibit, certificate, or other instrument furnished under and referring to this Agreement, then the prevailing party shall be entitled to be reimbursed for all costs, fees, and expenses incurred in connection with prosecuting or defending such claim, including reasonable attorneys' fees.

4.2  Other Agreements Superseded; Waiver and Modification, Etc.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties, except for written agreements executed contemporaneously herewith which expressly refer to this Agreement.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.  No waiver of any condition or provision shall be enforceable unless made in writing.  Nothing in this Agreement shall be construed to give any person or entity other than the parties hereto any rights or remedies.

4.3  Further Assurances.  Each party agrees to execute such instruments or documents or take such further action as the other may reasonably request to carry out the intent of this Agreement.

4.4  Notices.  Any notice relating to this Agreement shall be deemed sufficiently given and served for all purposes if and when given if personally served or sent by

4

facsimile to the fax number set forth below, on the first business day after sent if sent by federal express or other overnight delivery service addressed to the address set forth for such party above, or five business days after sent if deposited in the United States mail, postage or other charges prepaid and registered.

> If to Owner
> Or Parent:          (949) 612-2278
>
> If to Manager:       (559) 224-4615

Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

4.5  Law Governing.  This Agreement shall be construed and interpreted in accordance with and governed and enforced in all respects by the laws of the State of California, except that this Agreement shall be given a fair and reasonable construction in accordance with the intention of the parties and without regard to, or aid of, Section 1654 of the California Civil Code.

4.6  Headings.  The article and section headings throughout the Agreement are provided for convenience only and the words contained therein shall in no way be held to expand, amplify, modify, or aid in the interpretation or construction thereof.

4.7  Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, and successors of the parties hereto, but no right or liability or obligation arising hereunder may be assigned by any party hereto without the express written consent of the other parties.

4.8  Counterparts.  This Agreement may be executed in any number of counterparts and each such executed counterpart shall be deemed to be an original instrument, but all such executed counterparts together shall constitute one and the same instrument, and such instrument shall be deemed to have been made, executed, and delivered on the date first hereinabove written, irrespective of the time or times when the same or any counterparts thereof may have actually been executed and delivered.

4.9  Independent Contractor.  The parties acknowledge and agree that Manager is an independent contractor providing management services to Owner, that the parties are not engaged in any form of joint venture or partnership and that Manager is not a fiduciary or agent of Owner or Parent.

4.10  Severability.  In the event any of the provisions of this Agreement shall be declared by a court to be void or unenforceable, then such provision shall be severed from this Agreement without affecting the validity and enforceability of any of the other provisions hereof, and the parties shall negotiate in good faith to replace such unenforceable or void provisions with a similar clause to achieve, to the extent permitted under law, the purpose and intent of the provisions declared void and unenforceable.

4.11  Force Majeure.  Neither party shall be liable for any failure to perform due to acts of God or government or any state or political subdivision thereof, war, fires, floods, explosions or other catastrophes, civil disturbance, strikes, riots, unusual severe weather, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment, or other event beyond such party's reasonable control ("Force Majeure"). In such event, the performance of such party's obligations shall be suspended during, but not longer than, the period of existence of such cause and the period reasonably required to perform the obligation.  The parties will use their best efforts to minimize the consequences of Force Majeure.

4.12  Noncontinuing Waiver.  A waiver by any party of an existing or future default of any provision of this Agreement shall not be construed as a continuing waiver or a waiver of any future default and any subsequent default of any term hereof may be enforced as if no waiver had ever been made or granted.

IN CONSIDERATION OF THE FOREGOING, the parties have executed this Agreement as of the date first set forth above.

USDC FRESNO INC.

By:

USDC FRESNO 2 INC.

By:

U.S. DRY CLEANING CORPORATION

By:

GAMET ENTERPRISES, LLC

By:

6

50

# EXHIBIT "7"

| | |
|---|---|
| Amount: | $60,000.00 |
| Account: | 577861745 |
| Bank Number: | 51004029 |

| | |
|---|---|
| Sequence Number: | 1260789056 |
| Capture Date: | 02/08/2010 |
| Check Number: | 0 |

**Bank of America**

Checking/Maximizer/Business Money Market/
COR*/Withdrawal/Transfer
NOT NEGOTIABLE

05778-61745          INV# 3202          $          60,000.00

ACCOUNT NUMBER
RECEIVED FROM BANK OF AMERICA

Sixty Thousand    + no/100 ———————— DOLLARS

DATE    2/8/10                    X    7+ Jones
FOR BANK USE ONLY                    PLEASE SIGN IN TELLER PRESENCE
CONTRA    BOA                    USPA Fresno, Inc.
05-14-45993 05-2008  6-855552  Back of America, N.A. • Member FDIC    NAME (PLEASE PRINT)

⑈510040291⑈          0577861745⑈ 29    ⑈0006000000⑈

BANK OF AMERICA NB SEC
1260789056 N ESF42 01 01
02/08/10

1260789056

| | |
|---|---|
| Amount: | $9,372.82 |
| Account: | 577861769 |
| Bank Number: | 51004029 |

| | |
|---|---|
| Sequence Number: | 1260789055 |
| Capture Date: | 02/08/2010 |
| Check Number: | 0 |

**Bankof America**

Checking/Maximizer/Business Money Market/
COR&#42;/Withdrawal/Transfer
NOT NEGOTIABLE

05778-61769                    $        9372.82

ACCOUNT NUMBER
RECEIVED FROM BANK OF AMERICA

Nine Thousand three Quentiquog 82/100                DOLLARS

DATE  2/8/10
FOR BANK USE ONLY ▼        DDA

CONTRA
05-14-3599 B  05-2008  0-23-01  Bank of America, N.A. • Member FDIC

X
PLEASE SIGN IN TELLER'S PRESENCE

NAME (PLEASE PRINT)      TSN, Fresno 2, Inc.

⑈51004039⑈      05778617690 29    ⑈000093282⑈

BANK OF AMERICA WD SEC
#12209905 IV 14:42 03 03
02/98/10

1260789055

| | | | |
|---|---|---|---|
| Amount: | $69,372.82 | Sequence Number: | 1260789054 |
| Account: | 577461360 | Capture Date: | 02/08/2010 |
| Bank Number: | 51000095 | Check Number: | 0 |



Name  Team Enterprises LLC
Dba  Garnet Enterprises LLC

DEPOSIT TICKET

Bank of America

⑈510000956⑈ 05774⑈61360⑈          5⑈000693728 2⑈

Tran 03219    02/08/2010    12:58
Entity NCN  CC 0090577 Tlr 00007
Account    XXXXXXXX1360
R/TN 540930135
Deposit                    $69,372.82

```
──────────────ACTIVITY: MEMO POSTED ITEMS──────────────
                                                          MORE
   Account Type: DDA    Account Number: 05770-61480
   Account Title: ████████████████            Date Open: 10/07
          ████████████████

          BALANCE:              .00   Available:        .00
  ┌────────────────────────────────────────────────────────────┐
  │ DOLLAR AMOUNT    UNV PORTION    TYPE  DESCRIPTOR    UNIT# DELETE │
  └────────────────────────────────────────────────────────────┘
     ███████████        ██████/DR    ████████████  ███  2497
         59.45              .00   CR   VERIFIED    ACH   9999
         10.38              .00   CR   VERIFIED    ACH   9999
         78.56              .00   CR   VERIFIED    ACH   9999
         18.00              .00   CR   VERIFIED    ACH   9999
         25.68              .00   CR   VERIFIED    ACH   9999
         52.04              .00   CR   VERIFIED    ACH   9999
        572.39              .00   CR   VERIFIED    ACH   9999
        180.05              .00   CR   VERIFIED    ACH   9999
        604.26              .00   CR   VERIFIED    ACH   9999
```

Terminal Id: W0050821   User Id: 441840125   Tuesday, Feb. 9,2010        13:58:15

10 356. 49

54

# EXHIBIT "8"



# EXHIBIT "9"



# EXHIBIT "10"

**Tim Denari**

| | |
|---|---|
| **From:** | Andy Jones [andyjonesjd@yahoo.com] |
| **Sent:** | Friday, February 12, 2010 3:01 PM |
| **To:** | Robbie Lee |
| **Cc:** | Tim Denari; TOM JONES |
| **Subject:** | Tom Jones |

*LAW OFFICES OF*

## WAGNER & JONES LLP

***THE ATRIUM BUILDING***

***1111 EAST HERNDON AVENUE, SUITE 317***
***FRESNO, CALIFORNIA 93720-3100***
*Telephone (559) 445-1800*
*Fax # (559) 449-0749*

---

*NICHOLAS J.P. WAGNER*
*ANDREW B. JONES*
*DANIEL M. KOPFMAN*
*LAWRENCE M. ARTENIAN*
*PAUL C. MULLEN*

*LAKE TAHOE OFFICE*
*Post Office Box 8996*
*South Lake Tahoe, CA 96158*
*Telephone: (530) 541-6361*
*Fax # (530) 541-1735*

February 12, 2010

**FAX (494) 863-9657**

Mr. Robert Y. Lee, CEO/President
Mr. Tim Denari, CFO
USDC Fresno, Inc.
4040 McArthur Blvd.
Suite 305
Newport Beach, CA  92660

          Re:  **Thomas Jones**

Gentlemen:

          On Monday morning, February 8, 2010, it was learned that in
violation of the Management Agreement, Tim Denari back dated a check to
December 1, 2009, for $50,000.00 against one of the Fresno business
accounts, which under the Management Agreement, was to be used exclusively
for the Fresno operation.  Not only was this in violation of the
Management Agreement, outstanding checks written on that account for the
Fresno operation were pending and the action taken by Mr. Denari would

1

have resulted in return of multiple checks for insufficient funds.
Efforts to communicate with home office regarding the problem were
ignored; notice of your breach issued from Peter Zeitler.

       Upon review of the Management Agreement, the bank identified
improprieties with the company's back dated check and the funds were
secured to satisfy outstanding obligations of USDC Fresno, Inc., including
payroll. I have now been advised that the company swept the payroll
account and presently employees' checks are bouncing.

       This morning there was an effort to terminate Tom Jones from
management of all USDC Fresno operations in violation of the management
contract.  That will result in a legal dispute arising from the terms and
conditions of the Management Agreement.  Those issues are being handled by
Peter Zeitler.

       In the course of addressing employees today, Tim Denari verbally
slandered Thomas Jones by advising current employees that Tom was
terminated for embezzlement and further that criminal charges were being
filed.  This slander has occurred and cannot be retracted but the conduct
must immediately cease and desist.  You have full knowledge of the facts
sufficient to know that these are false and untrue statements and damaging
to Tom's reputation with employees who respect him.  You have a long
history with Tom, knowing that he has been more than fair with you in the
face of your financial problems. These are despicable falsehoods; this
behavior is unacceptable.  There will be repercussions.  The only question
is how far you as individuals endorse this behavior and are willing to let
this slander go on to serve your own desperate financial motives.

       Let me know of your immediate attention to preventing further
defamatory remarks. If you do not, you are ratifying and adopting this
intentional bad conduct as your own.

                         Very truly yours,

                         LAW OFFICES OF
                         WAGNER & JONES LLP



                         Andrew B. Jones


USDC0212-10


_____ Information from ESET NOD32 Antivirus, version of virus signature database 4869 (20100215)
_____

The message was checked by ESET NOD32 Antivirus.

2

http://www.eset.com

_____ Information from ESET NOD32 Antivirus, version of virus signature database 4913 (20100303)

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

3

1

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

2

# PROOF OF SERVICE OF DOCUMENT

3

4

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive., 4ᵗʰ Fl., Newport Beach, CA 92660.

5

6

7

A true and correct copy of the foregoing document described as **DECLARATION OF ROBERT Y. LEE IN SUPPORT OF THE FOLLOWING MOTIONS:1. CASH COLLATERAL 2. CONTRACT REJECTION AND TURNOVER 3. PAYROLL 4. UTILITY 5. LIMIT NOTICE** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

8

9

10

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 5, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

11

12

13

- Frank Cadigan    frank.cadigan@usdoj.gov
- Garrick A Hollander    sconnor@winthropcouchot.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Marc J Winthrop    pj@winthropcouchot.com

14

☐ Service information continued on attached page

15

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

16

17

18

☐ Service information continued on attached page

19

20

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

21

22

23

☐ Service information continued on attached page

24

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

25

| March 5, 2010 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

26

27

28

-13-

MAINDOCS-#141104-v1-Enivel_Lee_Decl_FirstDayMotions.DOC