SIMON ARON (SBN 108183)
SUSAN K. SEFLIN (SBN 213865)
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Boulevard
Ninth Floor
Los Angeles, California 90064-1565
Telephone: (310) 478-4100
Fax: (310) 479-1422

Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | ) Case No. 8:10-bk-12735-RK |
| | ) |
| ☒ ENIVEL, INC., a Hawaii corporation | ) Jointly Administered with Case Nos. |
| ☒ CLEANERS CLUB ACQUISITION | ) |
| SUB, INC., a California corporation | ) 8:10-bk-12742-RK; 8:10-bk-12740-RK; |
| ☒ STEAM PRESS HOLDINGS, INC., a | ) 8:10-bk-12748-RK; 8:10-bk-12745-RK; |
| Hawaii corporation | ) 8:10-bk-12746-RK; 8:10-bk-12736-RK & |
| ☒ U.S. DRY CLEANING SERVICES | ) 8:10-bk-12743-RK |
| CORPORATION, a Delaware | ) |
| corporation, dba U.S. DRY CLEANING | ) Chapter 11 |
| CORPORATION | ) |
| ☒ USDC FRESNO, INC., a California | ) **DEBTOR'S EMERGENCY MOTION FOR** |
| corporation | ) **ENTRY OF AN ORDER: (A) AUTHORIZING** |
| ☒ USDC FRESNO 2, INC., a California | ) **THE DEBTOR TO BORROW MONEY** |
| corporation | ) **SECURED BY PROPERTY OF THE ESTATE** |
| ☒ USDC PORTSMOUTH, INC., a | ) **PURSUANT TO 11 U.S.C. § 364 (c)(1) & (2)** |
| California corporation | ) **AND 364(d) ON AN INTERIM BASIS** |
| ☒ USDC TUCHMAN INDIANA, INC., a | ) **PENDING FINAL APPROVAL; AND (B)** |
| California corporation | ) **GRANTING RELATED RELIEF;** |
| | ) **DECLARATION OF ROBERT Y. LEE** |
| | ) |
| Debtors. | ) |
| | ) |
| | ) **Hearing:** |
| | ) |
| | ) Date:    July 28, 2010 |
| | ) Time:    9:00 a.m. |
| | ) Place:   Courtroom "5D" - Hon. Robert N. Kwan |
| | )          411 West Fourth St., Santa Ana, CA |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**SUMMARY**

Pursuant to Local Bankruptcy Rule 9075-1, Sections 105 and 364(c)(2) of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Enivel, Inc., Cleaners Club Acquisition Sub, Inc., Steam Press Holdings, Inc., U.S. Dry Cleaning Services Corporation dba U. S. Dry Cleaning Corporation, USDC Fresno, Inc., USDC Fresno 2, Inc., USDC Portsmouth, Inc., and USDC Tuchman Indiana, Inc., the jointly administered Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors"), hereby files this emergency motion (the "Motion") for entry of an order: (A) authorizing the Debtors to borrow money secured by property of the estate pursuant to 11 U.S.C. § 364 (c)(1) & (2) and (d); and (B) granting related relief.

As the Court is aware, there is an ongoing dispute between the Debtors and Gamet Enterprises, LLC, Team Equipment, Inc. and Bell Hop Cleaners of California (collectively, the "Gamet Parties"). Although the Debtors' operating and management agreement (the "Management Agreement") expired by its terms on June 30, 2010, the Gamet Parties remain wrongfully in control of one of the Debtors' bank accounts. It is undisputed that the Debtors own USDC Fresno, Inc. ("Fresno 1") and USDC Fresno 2, Inc. ("Fresno 2" and collectively, with Fresno 1, the "Fresno Debtors") and all the assets related thereto. The broad scope of 11 U.S.C. § 541 encompasses the Fresno Debtors and all of their assets – including revenue received from business operations.

In fact, the Gamet Parties ongoing control of assets of these estates is a violation of the automatic stay of 11 U.S.C. § 362, though that is an argument for a later date where the Debtor will seek, among other things, damages for the Gamet Parties' ongoing and repeated violations of the stay. The result of these stay violations is that the Debtors do not have control over all of their revenues. The Gamet Parties have control of the Fresno Debtors' revenues, and the Gamet Parties have (i) refused to turn over all revenues generated by the Fresno Debtors to as well as control of the bank accounts in violation of 11 U.S.C. § 362, and (ii) refused to comply with this Court's order entered on April 28, 2010 (the "Gamet Order") [Docket #110] which requires that while the Gamet Parties are in control of the Fresno Debtors, they shall "promptly" transfer to

USDC the Fresno Debtors' actual share of any U.S. Trustee fees and the Fresno Debtors' allocable share of any legal and professional fees. *See,* Stipulation for Interim Resolution of Debtors' Emergency Motion for Order: (1) Authorizing Rejection of Certain Executory Contracts; and (2) Compelling Turnover of Property of the Estate from Custodians (the "Gamet Stipulation")[Docket # 54], which was approved pursuant to entry of the Gamet Order on April 28, 2010.

As of the filing date of this Motion, the Gamet Parties, in violation of this Court's order, have not turned over expenses allocated to the Fresno Debtors (in the amount of at least $120,000) and have not turned over control of the account to the Debtors (since the Management Agreement expired on June 30, 2010). In addition to the $120,000 owed by the Gamet Parties to the Debtors pursuant to the Gamet Stipulation, the Gamet Parties also owe all other money collected by the Gamet Parties on behalf of the Fresno Debtors since the commencement of this case (an amount estimated to be at least an additional $120,000). In other words, the Debtors would have an additional $240,000 of cash in their debtor-in-possession bank accounts if the Gamet Parties were not in violation of this Court's order and the automatic stay.[1]

Because (i) it will take the Debtors time to obtain a Court order directing turnover of these funds to the Debtors, (ii) this is the slowest time of the year in the dry cleaning industry, and (iii) various parties in interest are concerned about the Debtors' cash flow, the Debtors' senior secured lender[2] has agreed to loan the Debtors up to $1 million as follows: (a) a $250,000 (the "Loan") immediate loan with a 3% charge (equal to $7,500) and an interest rate of 10% per annum; and (b) an additional $750,000 revolving line of credit (the "Credit Facility") with a 5% charge (equal to $37,500) and an interest rate of 10% per annum. For example, if the Debtors borrow the Loan for a one year time period, that means they will pay interest of $25,000 for that year. By this emergency Motion, the Debtor seeks to borrow the Loan on an interim basis, and will seek Court approval of the Credit Facility at the final hearing on the Motion.

---

[1] The Debtors believe this amount may be even higher but until a forensic accounting is performed, the Debtors do not know how many unauthorized payments the Gamet Parties have made post-petition.

[2] The "Senior Secured Lender" or "Setal" includes the following entities: Setal I, LLC; Setal 2, LLC; Setal 3, LLC, Setal 4, LLC, Setal 5, LLC, Setal 6, LLC, and the Taylor Family Trust dated March 3, 1994.

1   The Debtors' management conducted an extensive and active search for potential DIP

2   lenders from the end of March until June, and was unable to find available DIP financing on

3   terms remotely approaching those offered by the Senior Secured Lender.   Furthermore, the

4   Debtors' proposed Chief Restructuring Officer, Charles Moffitt, has recently testified and is

5   prepared to testify in this case of the lack of available DIP financing and the favorable terms

6   offered by the Senior Secured Lender.   The Debtors do not have an alternative source of

7   financing at this point in time.

8   While the Debtors believe that they have sufficient cash to operate their businesses, in an

9   abundance of caution and to address any concerns of the Court, the Office of the United States

10  Trustee and any other party, the Debtors are requesting approval of the Loan on an emergency

11  basis.   The complete bases for this emergency financing Motion are set forth below and in the

12  annexed Memorandum of Points and Authorities and the Declaration of Robert Y Lee (the "Lee

13  Declaration").   The Debtor reserves the right to supplement this Motion up until and/or at the

14  hearing on the Motion.

15  ### ADDITIONAL INFORMATION

16  This Emergency Motion is based on Sections 105 and 364 of the Bankruptcy Code,

17  Bankruptcy Rules 4001(c) and 6004(h), Local Bankruptcy Rules 2081-1(a)(9), 4001-2, and 9075-

18  1, this Motion, the supporting Memorandum of Points and Authorities, the Declaration of Robert

19  Y. Lee, the arguments and statements of counsel to be made at the hearing on the Motion, and

20  other admissible evidence properly brought before the Court.

21  **WHEREFORE**, Debtors respectfully request that this Court: (1) enter the proposed form

22  of financing order attached as Exhibit "B" to the Lee Declaration; (2) authorize Debtors to

23  borrow $250,000 from Setal on an interim basis in accordance with the terms set forth above and

24  in the Financing Order; (3) authorize Debtors to execute all documents (including all loan and

25  security agreements, promissory notes and related documents) necessary to enable Debtors to

26  implement the terms of the Financing Order; (4) schedule a final hearing on the Motion to

27  authorize Debtors to access the Credit Facility for up to an additional $750,000 ; and (5) grant

28

1    such other and further relief as the Court deems necessary and appropriate under the

2    circumstances.

3    Dated:  July 28, 2010              Enivel, Inc. et al.

By:_____

Simon Aron
Susan K. Seflin
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

A.    General Case Background.

1.    U.S. Dry Cleaning Services Corporation *dba* U. S. Dry Cleaning Corporation ("USDC"), through its wholly owned debtor subsidiaries, acquired in connection with its strategy to "rollup" the highly fragmented dry cleaning industry, has become the largest owner and operator of dry cleaning stores in the country. The Debtors currently employ approximately 600 employees and own and operate 71 dry cleaning stores generating in excess of $25 million in annual revenues.

B.    The Debtors' Secured Creditors.

2.    A schedule of creditors who assert secured claims against the Debtors' estates, along with the amount of such claims according to the Debtors' books and records is attached as Exhibit "1" to the Declaration of Robert Y. Lee (the "May Lee Declaration") filed in support of the Debtors' intercompany financing motion (the "Intercompany Motion").[3] The Debtors estimate that the aggregate amount of secured claims is in excess of $16,750,000. Of that amount, Setal's claims, which are secured by a first priority lien against substantially all of the Debtors' assets, total approximately $11,777,610 plus interest, late charges, attorneys' fee and other charges. The Debtors believe that the liquidation value of the collateral securing the claims of secured creditors is less than the aggregate of all claims held by Setal.

3.    The claims of Setal, Team Equipment, Inc. ("Team") and Bell Hop Cleaners of California, Inc. ("Bell Hop"), the Debtors' largest secured creditors, are summarized below.

a.    Setal. Setal made the following eight loans to the Debtors:[4]

---

[3] A true and correct copy of the Intercompany Motion with the May Lee Declaration [Docket # 132] is attached to the annexed Declaration of Robert Y. Lee (the "Lee Declaration") as Exhibit "A" for the Court's convenience.

[4] The information regarding Setal's loans is based on the Verified Statement of Penelope Parmes, Attorney for Secured Creditors, Pursuant to Federal Rule of Bankruptcy Procedure 2019(a) filed on April 19, 2010 as Docket No 89.

(i)     Setal 1, LLC:  Loan dated January 12, 2008 in the principal amount of $1.2 million, as modified and amended.  The estimated balance as of March 12, 2010 is $904,522.55;

(ii)    Setal 1, LLC: Loan dated February 12, 2008 in the principal amount of $1.5 million, as modified and amended.  The estimated balance as of March 12, 2010 is $1,178,130;

(iii)   Setal 3, LLC: Loan dated May 28, 2008 in the principal amount of $2.5 million, as modified and amended.  The estimated balance as of March 12, 2010 is $2,562,549;

(iv)    Setal 4, LLC: Loan dated June 26, 2008 in the principal amount of $2.0 million, as modified and amended.  The estimated balance as of March 12, 2010 is $2,106,736;

(v)     Setal 5, LLC: Loan dated June 26, 2008 in the principal amount of $1.5 million, as modified and amended.  The estimated balance as of March 12, 2010 is $1,174,618;

(vi)    Setal 6, LLC: Loan dated May 15, 2009 in the principal amount of $2.0 million, as modified and amended.  The estimated balance as of March 12, 2010 is $2,761,555;

(vii)   Taylor Family Trust: Loan dated March 20, 2009 in the principal amount of $975,000, as modified and amended.  The estimated balance as of March 31, 2010 is $1,178,955.51; and

(viii)  Taylor Family Trust: Loan dated January 5, 2010 in the principal amount of $545,000, as modified and amended.  The estimated balance as of April 12, 2010 is $545,000.

During the period of February 14, 2008 through October 30, 2008, Setal 1, LLC, Setal 2, LLC, Setal 3, LLC, Setal 4, LLC, Setal 5, LLC and the Taylor Family Trust filed UCC Financing Statements against USDC, Club Sub, Fresno, Fresno 2, Portsmouth and Tuchman.  Setal 6, LLC

1  filed an additional UCC Financing Statement against Portsmouth on June 3, 2009. Copies of the

2  UCC Financing Statements are attached to the Lee Declaration as Exhibit "2."

3              b.    <u>Team and Bell Hop</u>.  On or about February 2008, USDC executed a

4  promissory note in favor of Team and Bell Hop in the principal aggregate amount of

5  $1,650,867.  On April 14, 2009, <u>after the date on which all of Setal's UCC Financing</u>

6  <u>Statements were filed for the same debtors</u>, Team and Bell Hop filed UCC Financing

7  Statements against USDC, Steam Press, Club Sub, Fresno, Fresno 2 and USDCC CVR

8  Merger Sub, LLC.  Copies of the UCC Financing Statements filed by Team and Bell are

9  attached to the Lee Declaration as Exhibit "3."  Team and Bell Hop also assert a

10  possessory lien based on a management agreement entered into on or about December 7,

11  2009.  Notably, neither Team nor Bell asserts a secured claim against Portsmouth and

12  Tuchman, two of the three Lending Debtors.

13  C.   <u>The Need for Financing.</u>

14        4.    While the Debtors consist of eight separate entities, the Debtors are not in control

15  of the cash collateral of two of their entities due to the ongoing dispute between the Debtors and

16  Gamet Enterprises, LLC, Team Equipment, Inc. and Bell Hop Cleaners of California

17  (collectively, the "Gamet Parties").  Although the Debtors' operating and management agreement

18  (the "Management Agreement") with the Game Parties has expired by its terms, the Gamet

19  Parties still maintain control and possession over the Debtors' cash collateral.

20        5.    It is undisputed that the Debtors own USDC Fresno, Inc. ("Fresno 1") and USDC

21  Fresno 2, Inc. ("Fresno 2" and collectively, with Fresno 1, the "Fresno Debtors").  While the

22  Gamet parties may believe that there is a basis to assert control and ownership over assets of

23  these estates, the Debtors' disputes these allegations, and believe that the Fresno Debtors' cash

24  collateral should be under the Debtors' control as a debtors in possession.

25        6.    The Gamet Parties continue to maintain control and possession of the Fresno

26  Debtors' cash collateral, which is in violation of this Court's order entered on April 28, 2010 (the

27  "Gamet Order") [Docket #110] which requires that while the Gamet Parties are in control of the

28  Fresno Debtors, they shall "promptly" transfer to USDC the Fresno Debtors' actual share of any

U.S. Trustee fees and the Fresno Debtors' allocable share of any legal and professional fees. *See,*
Stipulation for Interim Resolution of Debtors' Emergency Motion for Order: (1) Authorizing
Rejection of Certain Executory Contracts; and (2) Compelling Turnover of Property of the Estate
from Custodians (the "Gamet Stipulation")[Docket # 54], which was approved pursuant to entry
of the Gamet Order on April 28, 2010.

7.    The dry cleaning business is seasonal, and demand fluctuates throughout the year.
Historically, this time of the year is the worst season, which means that revenues are lowest at
this time of year.

8.    Because (i) it will take the Debtors time to obtain a Court order directing turnover
of the Fresno Debtors' cash collateral to the Debtors, (ii) this is the slowest time of the year for
the dry cleaning industry, and (iii) various parties in interest are concerned about the Debtors'
cash flow, Setal has agreed to loan the Debtors up to $1 million as follows: (a) a $250,000 (the
"Loan") immediate loan with a 3% charge (equal to $7,500) at an interest rate of 10% per year;
and (b) an additional $750,000 revolving line of credit (the "Credit Facility") with a 5% charge
(equal to $37,500) at an interest rate of 10% a year.  For example, if the Debtors borrow the Loan
for a one year time period, that means they will pay interest of $25,000 for that year.  By this
emergency Motion, the Debtor seeks to borrow the Loan on an interim basis, and will seek Court
approval of the Credit Facility at the final hearing on the Motion.

9.    The Debtors' management conducted an extensive and active search for potential
DIP lenders from the end of March until June, and was unable to find available financing for
anywhere near what the Senior Secured Lender has offered.  Furthermore, the Debtors' proposed
Chief Restructuring Officer, Charles Moffitt, is willing to testify as to the market place and the
lack of available financing.  The Debtors do not have an alternative source of financing at this
point in time.  The Debtors' believe that the post-petition financing from Setal is the "best" deal
that the Debtors will find.

10.    The principal amount of the Loan and any outstanding balance on the Credit
Facility plus accrued interest shall become due and immediately payable upon the earlier of the
following: (i) expiration of 180 days from the date of the entry of the order approving this

9

Motion; (ii) conversion of the case to one under Chapter 7 of the Bankruptcy Code; (iii) dismissal of the case; (iv) the appointment of a Chapter 11 trustee; or (v) the effective date under confirmation of a plan of reorganization.

11.     <u>Collateral for the Loan on an Interim Basis:</u>  Pursuant to 11 U.S.C. § 364(c)(1) and (d)(1), the Loan will be secured by a first priority priming lien on all assets of these estates except for the Debtors' real estate leases.

12.     <u>Collateral for the Loan and Credit Facility on a Final Basis:</u>  Pursuant to 11 U.S.C. § 364(c)(1), (c)(2) and (d)(1), the Loan and the Credit Facility (collectively, the "DIP Loan") will be secured by a first priority priming lien on all assets of these estates.

13.     In light of the circumstances of these cases, the Debtors submit that the proposed financing is fair and reasonable and, to date, the only financing available to the Debtors that is not predatory.  Without immediate access to the Fresno Debtors' cash collateral, immediate financing is necessary to preserve the Debtors' business.

II.

<u>COMPLIANCE WITH RULE 4001</u>

Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtors hereby provide the following disclosures with respect to the DIP Loan:

| | | |
|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Does apply | The Loan: The Loan, on an interim basis, will be secured by a first priority priming lien on all assets of these estates except for the Debtors' real estate leases. The Loan will have priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code. As the Senior Secured Lender, Setal already has a first priority lien in all of the assets of these estates.

The DIP Loan: On a final basis, the DIP Loan will be secured by liens which will be senior to perfected, valid and enforceable liens existing on the petition date on all of the Debtors' assets with priority over all administrative expenses of the kind specified in |

| | | sections 503(b) or 507(b) of the Bankruptcy Code. |
|---|---|---|
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | Does not apply | |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | Does not apply | |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Does not apply | |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Does not apply | |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | Does not apply | |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Does apply | The Final DIP Order will waive the requirement of the perfection of the post-petition liens being granted to Setal to secure the Debtors' post-petition obligations to Setal, which the Debtors submit is a routine right granted to a post-petition lender. |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Does not apply | |
| The indemnity of an entity | Does not apply | |
| A release, waiver, or limitation of any right under Section 506(c) | Does not apply | |

| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Does not apply | |
|---|---|---|

## IV.   DISCUSSION

A.   The Debtors Should Be Authorized To Obtain Debtor In Possession Financing From Setal To Operate, Maintain And Preserve Their Business.

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtors request authority to incur up to $1 million of post-petition financing from Setal (with $250,000 to be advance pursuant to an interim Court order as a loan (previously defined as the "Loan") and the remaining amount to be available as a Credit Facility pursuant to final Court order) allowable as an administrative expense, having priority over all other administrative expenses and secured by a senior lien on all assets of the Debtors' estates, except on an interim basis, the collateral of the $250,000 Loan will not include the Debtors' real estate leases.  The Debtors need additional funding to meet their obligations necessary to operate their businesses, administer their Chapter 11 estates and increase the going concern value of the Debtors' businesses.  Without the Debtors ability to have access to the Fresno Debtors' cash collateral, the Debtors' most recent budget filed with this Court illustrates that it is likely the Debtors will not have sufficient cash to cover their operating expenses in the next three weeks.

Unless the Debtors obtain immediate financing, the estates and all creditors will be irreparably harmed.  Immediate funding is necessary in order to ensure that the Debtors have sufficient cash in the next three weeks.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment

12

consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

(c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)   with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:

(2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)   secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

(1)      the trustee is unable to obtain such credit otherwise; and

(2)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d)(1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.  In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989).  Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions.   In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991).  For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a

hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts frequently have authorized the use of inducements not specified in the statute. See, e.g., In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

Subject to the approval of the Court, Debtors have agreed to grant to Setal liens against all of Debtors' assets senior to any and all existing liens (except for Debtors' real estate leases on an interim basis with respect to the $250,000 Loan) and have agreed that any administrative claim in favor of Setal will have priority over all other administrative claims. For all of the reasons explained herein, the Debtors believe that granting these protections to Setal is warranted, appropriate and necessary given the circumstances of these cases where Setal has agreed to provide the Debtors with critically necessary emergency and future financing.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

Debtors submit that all of these standards have been satisfied in these cases.

1.      Debtors Were Unable To Obtain Unsecured Credit.  In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

The accompanying Declaration of Robert Y. Lee discusses the Debtors' efforts post-petition to obtain financing, which efforts were not successful.  The Debtors' proposed Chief Restructuring Officer, Chuck Millet, will be available at the emergency hearing on the Motion to discuss the available financing, and the fact that the DIP Loan is way more favorable to the Debtors than any other financing available to debtors in possession.  Based on this testimony, Debtors submit that this element has been satisfied.

2.      The Terms Of The Proposed Financing Are Fair, Reasonable and Adequate.  Debtors submit that terms of the proposed post-petition financing from Setal are fair, reasonable and adequate.  Setal is not an insider of the Debtors. Setal is the Debtors' current senior secured lender, with perfected security interests in all of the assets of the Debtors' estates.  Setal has agreed to provide financing to the Debtors at an interest rate of 10% -- which is far below the market rate for debtors in possession.  Setal has agreed to a 3% charge on the $250,000 Loan (or $7,500) and a 5% charge on the $750,000 Credit Facility (or $37,500), which are better origination fees than are currently available to companies in a chapter 11 bankruptcy.  Setal is

taking on a substantial economic risk by loaning cash to companies that already owe Setal in excess of $16 million, and which, in a liquidation, would not pay off Setal's pre-petition secured debt. The DIP Loan offers the Debtors the best opportunity to obtain post-petition financing, at rates far below the market. The terms of the Setal post-petition financing were extensively negotiated by and between Debtors and Setal in an arms length transaction. The financing terms offered by Setal are the best financing terms which have been offered to Debtors.

     3.    <u>The Liens Being "Subordinated" Are Adequately Protected</u>.  The proposed priming liens are authorized by the Bankruptcy Code, even absent consent of other existing lien holders. Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defined the term "adequate protection". However, Bankruptcy Code §361 provides that adequate protection is furnished to the extent Debtors' "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. <u>See e.g.</u>, <u>In re Planned System, Inc.</u>, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). <u>See</u>, <u>e.g.</u>, <u>In re Hubbard Power & Light</u>, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); <u>In re Aqua Assoc.</u>, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); <u>In re Beker Ind. Corp.</u>, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

    The Court has broad discretion to determine whether adequate protection is furnished. <u>See e.g.</u>, <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in <u>Aqua Assoc.</u>, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion
> should be a relevant factor, it should not be a determinative factor

in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

Id. at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In Stein, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. See also In re McCombs, supra, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Such adequate protection of any existing liens is present in the Debtors' cases because without the proposed financing from Setal or the use of the Fresno Debtors' cash collateral, Debtors would likely be required to permanently shut down and all of Debtors' going concern value would be immediately and permanently lost. In contrast, the Setal financing enables Debtors to pay all expenses in their budget, and maintain a comfortable cash cushion in case any extraordinary expenses arise. The Debtors' ongoing business operations create value for all parties, particularly the secured lenders in these cases, and realize the full potential of Debtors' business. The Debtors' proposed CRO will testify at the emergency hearing on the Motion as to the value created.

Further, Debtors have reduced their operating expenses as much as possible in order to maximize Debtors' profitability. In a similar situation, the Court in the Matter of Pursuit Athletic

Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996), considered this issue and allowed the use of

cash collateral, accepting the debtor's argument that no additional adequate protection payments

need be made:

> if there is no actual diminution in the value of [the] collateral
> through the date of the hearing, and [Debtor] can operate profitably
> post-petition, [creditor] is adequately protected for the use of its
> cash collateral. 11 U.S.C. Section 361; In re Newark Airport/Hotel
> Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re
> Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re
> Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

    4.   The Financing From Setal Is Necessary And Proper.    While in determining

whether to approve such a transaction, a Court is authorized to act in its informed discretion, In

re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the Court should give

broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a

debtor's business judgment regarding the need for and proposed use of funds.    Richmond

Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). As the Court noted in In

re Ames Dept. Stores Inc., supra, "the court's discretion under section 364 is to be utilized on the

grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ." In re

Ames Department Stores, Inc., 115 B.R. at 40.

    Without additional financing or access to the Fresno Debtors' cash collateral, Debtors

will likely be required to permanently shut down their business operations as Debtors would not

be able to pay any operating expenses.    This would result in irreparable harm for Debtors and all

creditors of the estates.    In contrast, the potential value of the business, if Debtors are able to

operate, would increase substantially as the Debtors expect to file their Chapter 11 plan of

reorganization in the new few weeks.    Debtors have therefore concluded that obtaining post-

petition financing on the proposed terms herein is in the best interests of the Debtors' estates.

B.    Debtors Have Satisfied The Procedural Requirements Regarding Approval Of The

    Proposed Financing.

    Bankruptcy Rules 4001(c) and (d) sets forth procedural requirements for obtaining post-

petition credit.    There are three general provisions of these Bankruptcy Rules.    First, the Motion

must contain a copy of the proposed form of financing order, which has been done by attaching the proposed form of financing order as Exhibit "B" to the Lee Declaration.  Second, the Motion must provide a concise statement of the relief requested, which was done above.  Third, the Motion is required to be served on the creditors committee.  Here, all ECF parties will be served. Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(c) and (d). Also, Debtors have addressed the issues raised in Bankruptcy Rule 4001(c) regarding a motion for obtaining post-petition credit.

## V.    **CONCLUSION**

**WHEREFORE**, Debtors respectfully request that this Court: (1) enter the proposed form of Financing Order attached as Exhibit "B" to the Lee Declaration; (2) authorize Debtors to borrow $250,000 from Setal on an interim basis in accordance with the terms set forth above and in the Financing Order; (3) authorize Debtors to execute all documents (including all loan and security agreements, promissory notes and related documents) necessary to enable Debtors to implement the terms of the Financing Order; (4) schedule a final hearing on the Motion to authorize Debtors to access the Credit Facility for up to an additional $750,000 ; and (5) grant such other and further relief as the Court deems necessary and appropriate under the circumstances.

Dated: July 28, 2010                           Enivel, Inc. et al.


By:_____
Simon Aron
Susan K. Seflin
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

19

### DECLARATION OF ROBERT Y. LEE

I, Robert Y. Lee, hereby declare as follows;

1.     Unless indicated otherwise, I have personal knowledge of the facts set forth below, and, if called to testify, would and could competently testify thereto.  I am the President and Chief Executive Officer of Enivel, Inc., Cleaners Club Acquisition Sub, Inc., Steam Press Holdings, Inc., U.S. Dry Cleaning Services Corporation *dba* U. S. Dry Cleaning Corporation, USDC Fresno, Inc., USDC Fresno 2, Inc., USDC Portsmouth, Inc., and USDC Tuchman Indiana, Inc., the jointly administered Chapter 11 debtors and debtors in possession herein (collectively, the "Debtors").  I am responsible for overseeing the operations and financial performance of the Debtors, and am intimately familiar with the Debtors, their operations and their financial affairs.

2.     I submit this declaration in support of the Debtors' emergency motion (the "Motion") to which this declaration is annexed.  I have reviewed the Motion and agree with the facts set forth therein.

3.     U.S. Dry Cleaning Services Corporation *dba* U. S. Dry Cleaning Corporation ("USDC"), through its wholly owned debtor subsidiaries, acquired in connection with its strategy to "rollup" the highly fragmented dry cleaning industry, has become the largest owner and operator of dry cleaning stores in the country.  The Debtors currently employ approximately 600 employees and own and operate 71 dry cleaning stores generating in excess of $25 million in annual revenues.

4.     The Debtors estimate that the aggregate amount of secured claims is in excess of $16,750,000.  Of that amount, Setal's claims, which are secured by a first priority lien against substantially all of the Debtors' assets, total approximately $11,777,610 plus interest, late charges, attorneys' fee and other charges.  I believe that the liquidation value of the collateral securing the claims of secured creditors is less than the aggregate of all claims held by Setal.

5.     The claims of Setal, Team Equipment, Inc. ("Team") and Bell Hop Cleaners of California, Inc. ("Bell Hop"), the Debtors' largest secured creditors, are summarized below.

a.    Setal. Setal made the following eight loans to the Debtors:[5]

(ix)    Setal 1, LLC: Loan dated January 12, 2008 in the principal amount of $1.2 million, as modified and amended. The estimated balance as of March 12, 2010 is $904,522.55;

(x)    Setal 1, LLC: Loan dated February 12, 2008 in the principal amount of $1.5 million, as modified and amended. The estimated balance as of March 12, 2010 is $1,178,130;

(xi)    Setal 3, LLC: Loan dated May 28, 2008 in the principal amount of $2.5 million, as modified and amended. The estimated balance as of March 12, 2010 is $2,562,549;

(xii)    Setal 4, LLC: Loan dated June 26, 2008 in the principal amount of $2.0 million, as modified and amended. The estimated balance as of March 12, 2010 is $2,106,736;

(xiii)    Setal 5, LLC: Loan dated June 26, 2008 in the principal amount of $1.5 million, as modified and amended. The estimated balance as of March 12, 2010 is $1,174,618;

(xiv)    Setal 6, LLC: Loan dated May 15, 2009 in the principal amount of $2.0 million, as modified and amended. The estimated balance as of March 12, 2010 is $2,761,555;

(xv)    Taylor Family Trust: Loan dated March 20, 2009 in the principal amount of $975,000, as modified and amended. The estimated balance as of March 31, 2010 is $1,178,955.51; and

(xvi)    Taylor Family Trust: Loan dated January 5, 2010 in the principal amount of $545,000, as modified and amended. The estimated balance as of April 12, 2010 is $545,000.

---

[5] The information regarding Setal's loans is based on the Verified Statement of Penelope Parmes, Attorney for Secured Creditors, Pursuant to Federal Rule of Bankruptcy Procedure 2019(a) filed on April 19, 2010 as Docket No 89.

During the period of February 14, 2008 through October 30, 2008, Setal 1, LLC, Setal 2, LLC, Setal 3, LLC, Setal 4, LLC, Setal 5, LLC and the Taylor Family Trust filed UCC Financing Statements against USDC, Club Sub, Fresno, Fresno 2, Portsmouth and Tuchman. Setal 6, LLC filed an additional UCC Financing Statement against Portsmouth on June 3, 2009. Copies of the UCC Financing Statements are attached to the First Lee Declaration as Exhibit "2."

        b.   <u>Team and Bell Hop</u>.  On or about February 2008, USDC executed a promissory note in favor of Team and Bell Hop in the principal aggregate amount of $1,650,867. On April 14, 2009, <u>after the date on which all of Setal's UCC Financing Statements were filed for the same debtors</u>, Team and Bell Hop filed UCC Financing Statements against USDC, Steam Press, Club Sub, Fresno, Fresno 2 and USDCC CVR Merger Sub, LLC. Copies of the UCC Financing Statements filed by Team and Bell are attached to the First Lee Declaration as Exhibit "3." Team and Bell Hop also assert a possessory lien based on a management agreement entered into on or about December 7, 2009. .

C.   <u>The Need for Financing.</u>

      6.   While the Debtors consist of eight separate entities, the Debtors are not in control of the cash collateral of two of their entities due to the ongoing dispute between the Debtors and Gamet Enterprises, LLC, Team Equipment, Inc. and Bell Hop Cleaners of California (collectively, the "Gamet Parties"). Although the Debtors' operating and management agreement (the "Management Agreement") with the Game Parties has expired by its terms, the Gamet Parties still maintain control and possession over the Debtors' cash collateral.

      7.   The Debtors own USDC Fresno, Inc. ("Fresno 1") and USDC Fresno 2, Inc. ("Fresno 2" and collectively, with Fresno 1, the "Fresno Debtors"). While the Gamet parties may believe that there is a basis to assert control and ownership over assets of these estates, I believe that all cash collateral generated by the Fresno Debtors is property of these estates.

      8.   The dry cleaning business is seasonal, and demand fluctuates throughout the year. Historically, this time of the year is the worst season, which means that revenues are lowest at this time of year.

9.      Because (i) it will take the Debtors time to obtain a Court order directing turnover of the Fresno Debtors' cash collateral to the Debtors, (ii) this is the slowest time of the year for the dry cleaning industry, and (iii) various parties in interest are concerned about the Debtors' cash flow, Setal has agreed to loan the Debtors up to $1 million as follows: (a) a $250,000 (the "Loan") immediate loan with a 3% charge (equal to $7,500) at an interest rate of 10% per year; and (b) an additional $750,000 revolving line of credit (the "Credit Facility") with a 5% charge (equal to $37,500) at an interest rate of 10% a year.  For example, if the Debtors borrow the Loan for a one year time period, that means they will pay interest of $25,000 for that year.  By the emergency Motion, the Debtor seeks to borrow the Loan on an interim basis, and will seek Court approval of the Credit Facility at the final hearing on the Motion.

10.      From March through June, I conducted an extensive and active search for potential DIP lenders, and was unable to find available financing for anywhere near what the Debtors have negotiated with Setal.  There is no financing attractive as the financing available to the Debtors here – in or outside of bankruptcy, and especially since Setal has a first priority line in all of the Debtors' assets. The Debtors do not have an alternative source of financing at this point in time.  I believe that the post-petition financing from Setal is the "best" deal that the Debtors will find.

11.      The principal amount of the Loan and any outstanding balance on the Credit Facility plus accrued interest shall become due and immediately payable upon the earlier of the following: (i) expiration of 180 days from the date of the entry of the order approving this Motion; (ii) conversion of the case to one under Chapter 7 of the Bankruptcy Code; (iii) dismissal of the case; (iv) the appointment of a Chapter 11 trustee; or (v) the effective date under confirmation of a plan of reorganization.

12.      <u>Collateral for the Loan on an Interim Basis:</u>  Pursuant to 11 U.S.C. § 364(c)(1) and (d)(1), the Loan will be secured by a first priority priming lien on all assets of these estates except for the Debtors' real estate leases, and any administrative claim of Setal will have administrative priority over all administrative claims.

1    13.    <u>Collateral for the Loan and Credit Facility on a Final Basis:</u> Pursuant to 11 U.S.C.

2    § 364(c)(1), (c)(2) and (d)(1), the Loan and the Credit Facility (collectively, the "DIP Loan") will

3    be secured by a first priority priming lien on all assets of these estates, and any administrative

4    claim of Setal will have administrative priority over all administrative claims.

5    14.    In light of the circumstances of these cases, I submit that the proposed financing is

6    fair and reasonable and, to date, the only financing available to the Debtors that is not predatory.

7    Without immediate access to the Fresno Debtors' cash collateral, immediate financing is

8    necessary to preserve the Debtors' business.  Without financing, the Debtors may run out of cash

9    in the next three weeks.

10    I declare under penalty of perjury that the foregoing is true and correct.

11    Executed this 28th day of July, 2010, at Newport Beach, California.

13    _____

14    Robert Y. Lee